T.C. Memo. 2009-68

UNITED STATES TAX COURT

MICHAEL SCOTT IOANE AND SHELLY JEAN OLSON-IOANE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9903-06.                    Filed March 26, 2009.

        R determined deficiencies in Federal income tax
for Ps' 2002 and 2003 tax years.  R also determined an
addition to tax pursuant to sec. 6651(a)(1), I.R.C.,
for Ps' 2002 tax year and accuracy-related penalties
pursuant to sec. 6662(a) for P's 2002 and 2003 tax
years.

        Held:  Ps are liable for the deficiencies, addition to
tax, and accuracy-related penalties.  Ps are also liable for
a penalty under sec. 6673(a)(1), I.R.C., because their
position in this case is frivolous.


Michael Scott Ioane and Shelly Jean Olson-Ioane, pro sese.

Wesley J. Wong and David W. Sorensen, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  This case is before the Court on a petition for redetermination of deficiencies concerning petitioners' 2002 and 2003 tax years.  Respondent determined that petitioners are liable for Federal income tax deficiencies of $2,104,868 and $457,468 for their 2002 and 2003 tax years, respectively. Respondent also determined a $314,754.30 addition to tax pursuant to section 6651(a)(1)[1]  for their 2002 tax year and accuracy-related penalties under section 6662(a) of $420,973.60 and $91,493.60 for their 2002 and 2003 tax years, respectively.  On brief, respondent concedes that petitioners are not liable for unreported interest income of $1,060.26 in 2002 and $18 in 2003. The issues remaining for decision are:

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code, as amended and in effect for the tax years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

1) Whether the income of various trusts[2] and $140,711 in distributions from a corporation are income to petitioners in 2002 and 2003;

2) whether petitioners are liable for self-employment tax for 2002 and 2003;

3) whether petitioners are entitled to a $14,562 deduction for 2002 and a $14,823 deduction for 2003, as claimed on Schedules C, Profit or Loss From Business, for those tax years;

---

[2]The following is a list of the "Unexplained Deposits" into the trusts' accounts that respondent has attributed as income to petitioners:

| Entity | 2002 | 2003 |
|---|---|---|
| First Amendment Publishers Trust | $2,229,987 | $838,890 |
| American Federal Trust | $1,124,357 | $55,700 |
| Charitable Scholarship Foundation | $1,309,482 | $58,410 |
| Acacia Charitable Foundation | $496,066 | $106,759 |
| Paradise Solutions Trust | --- | $19,922 |

Respondent also attributed to petitioners dividend income of $15,287.90 in 2002 and $22,082.68 in 2003. Those amounts were based on dividends deposited into accounts held by First Amendment Publishers Trust, American Federal Trust, Charitable Scholarship Foundation, and Acacia Charitable Foundation.

4) whether petitioners are entitled to a deduction for a $99,172,118 net operating loss (NOL) in 2002 and for a $99,134,330 NOL carryover in 2003;

5) whether petitioners are entitled to itemized deductions of $8,840 for medical and dental expenses in 2002;

6) whether petitioners are entitled to personal exemptions of $15,000 in 2002 and $15,250 in 2003, an earned income tax credit of $2,194 in 2003, and additional child tax credits of $1,800 in 2002 and $1,377 in 2003;

7) whether petitioners are liable for a $314,754.30 addition to tax under section 6651(a)(1) for 2002; and

8) whether petitioners are liable for accuracy-related penalties under section 6662(a) of $420,973.60 for 2002 and $91,493.60 for 2003.

FINDINGS OF FACT

At the time they filed their petition, petitioners, who are husband and wife, resided in Nevada.

At the heart of this case are five trusts whose 2002 and 2003 income respondent has determined is attributable to petitioners. The five trusts are (1) First Amendment Publishers (FAP); (2) American Federal Trust (AFT); (3) Charitable Scholarship Foundation (CSF); (4) Acacia Charitable Foundation (ACF); and (5) Paradise Solutions Trust (PST).

Also at issue is a corporation, Acacia Corporate Management (ACM), from which respondent determined petitioners received distributions in 2003. ACM was apparently incorporated in Nevada.[3]

Petitioners filed joint Forms 1040, U.S. Individual Income Tax Return, for their 2002 and 2003 tax years. The 2002 return was prepared by "Mary R. Fuentez".[4] The 2003 return was self-prepared. Revenue Agent Dennis Brown (Agent Brown) examined petitioners' 2002 and 2003 returns. Petitioners did not cooperate with Agent Brown during the examination process, and Agent Brown developed the case by contacting and issuing summonses to third parties. Although Agent Brown was unable to identify any individual checking or savings accounts petitioners used regularly, he identified entities with which petitioners appeared to be associated. He then summoned and received checks and other records from financial institutions with which those entities held accounts. He requested but never received formation documents relating to FAP, AFT, CSF, ACF, PST, and ACM.

_____

[3]We will take judicial notice of the Nevada secretary of state's business records, which appear to reflect that ACM was incorporated on Nov. 20, 2000, and was dissolved on Mar. 18, 2005.

[4]Although Mr. Ioane referred to Mary Fuentez as a certified public accountant, there is no evidence that she was one.

Because the parties have stipulated very little, most of the relevant facts have been gleaned from trial testimony and from exhibits admitted into evidence at trial. Relevant facts relating to petitioners' relationship with each of the relevant entities are provided below.

FAP

During or around 1998 Richard Allen Ceraolo (Mr. Ceraolo) was introduced to Mr. Ioane, who identified himself as a trust expert. Mr. Ceraolo and his wife, Angie (Mrs. Ceraolo), eventually hired FAP to establish trusts and provide tax advice. At some point, Mr. Ioane handed Mr. Ceraolo an engagement letter addressed from FAP to Mrs. Ceraolo together with a cover letter and an invoice both of which were dated October 19, 2000. It was common for Mr. Ceraolo to receive correspondence from Mr. Ioane on FAP letterhead, and Mr. Ioane referred to FAP as a trust that Mr. Ioane had established.

Around that time, Mr. Ioane helped Jay M. Steuer (Mr. Steuer) set up trusts for Cade Co. (a business in which Mr. Steuer owned a 25 percent interest) and for Mr. Steuer personally. Cade Co. funds were then channeled through FAP. Mr. Steuer received his Cade Co. distributions through FAP and two other trusts, North Bay Associates and Jewish Education Foundation. Mr. Ioane handled those funds. It was Mr. Steuer's understanding that FAP was Mr. Ioane's trust.

A sampling of canceled checks[5] and bank statements[6] from FAP's accounts at (1) Saratoga National Bank (which subsequently became part of San Jose National Bank), (2) California Federal Bank, (3) Wells Fargo Bank, (4) Morgan Stanley, and (5) Charles Schwab reflects that checks to Capital One, Nordstrom, Target, Providian Financial, Merced Christian School, Stone Ridge Christian High School, and Blue Cross of California were written on petitioners' behalf from those accounts.[7]  FAP also wrote a check to Mr. Ioane for a "car purchase", and Mrs. Ioane endorsed an FAP check made payable to cash.  The checks were signed using the signature stamps of "Laurel Fierro" or "Glen Halliday".[8]

_____

[5]Attached as an appendix to this opinion is a table containing examples of checks reflecting (on a preponderance of available evidence) payments to petitioners, by petitioners, or on behalf of petitioners from the entities' accounts.  Some of those checks are also mentioned in this opinion.

[6]At trial, petitioners objected to the admissibility of exhibits containing checks, account applications, signature cards, bank statements, and deposit slips.  Although we overruled petitioners' objections as to the checks, we reserved judgment as to the other documents and invited the parties to brief that issue.  We overrule petitioners' objections to those documents, as is explained later in this opinion.  See infra pp. 13-19.

[7]The memo sections of the checks paid to Capital One, Nordstrom, Target, Providian Financial, and Blue Cross of California reflect petitioners' account numbers and sometimes even their names.  The memo sections of the checks paid to Merced Christian School and Stone Ridge Christian High School reflect notations such as "IOANE / Balance of tuition due + $1.50 Nov. ECS" and one of petitioners' children's names followed by "partial payment/tuition".

[8]In addition to the fact that checks were written from FAP's
(continued...)

In a prior Tax Court case at docket No. 21063-04 involving FAP, Mr. Ioane signed a "Consent to Rescind Notice of Deficiency", which was filed as a petition on behalf of FAP. In that document Mr. Ioane referred to himself as "Michael S. Ioane, general trustee For MICHAEL SCOTT IOANE, whom [sic] is the underlying funding Source and POA for FIRST AMENDMENT PUBLISHERS". In addition, FAP's address, as listed on that petition--108 East John Street, Carson City, Nevada 89706 (East John Street address)--is the same address petitioners listed in their petition in this case.

Agent Brown used the bank deposits method to reconstruct FAP's income for 2002 and 2003. He determined that FAP had unexplained bank deposits of $2,229,987.48 in 2002 and of $838,889.72 in 2003. He also determined that FAP had received $6,946.97 in dividends in 2002.[9]

AFT

AFT held an account with Dean Witter Reynolds, Inc.(now Morgan Stanley). Mr. Ioane is listed as one of two grantors of

---

[8](...continued)
accounts for petitioners, checks payable to Mr. Ioane were deposited into FAP's account at Saratoga National Bank.

[9]In one part of the Form 886-A, Explanation of Items, attached to the notice of deficiency, the total dividends received by FAP in 2002 add up to $6,947.18. This is apparently due to a 21-cent error in the amount of dividends received from Morgan Stanley. Respondent used the $6,946.97 figure in computing all of the trusts's 2002 dividend income.

AFT on the account application. "Eric Wennerstrand" is listed as the trustee and "Laurel Fierro and/or Judie Rogers" are listed as the successor trustees.[10] The signature card of California Federal Bank[11] for AFT listed Mr. Ioane as an authorized signer. AFT's signature card for its account at Saratoga National Bank listed petitioners as trustors of AFT. Petitioners wrote checks to FAP, CSF, and ACF from that account. Those checks were signed by Mrs. Olson-Ioane and with the signature stamp of Jeffrey P. Rosenberg.

On November 2, 2004, Mr. Ioane filed with the Tax Court a "Consent to Rescind Notice of Deficiency", which the Court construed as a petition on AFT's behalf and to which it assigned docket No. 21065-04. Therein, he referred to himself as "general trustee" and "underlying funding Source and POA for AMERICAN FEDERAL TRUST". He listed the East John Street address as AFT's address.

Agent Brown used the bank deposits method to reconstruct AFT's income for 2002 and 2003. He determined that AFT had unexplained bank deposits of $1,124,356.69 in 2002 and of $55,700 in 2003. He also determined that AFT had received $2,926.71 in dividends in 2002.

---

[10]"Jeffrey P. Rosenberg" was also named as a trustee of AFT.

[11]California Federal Bank is now a part of Citigroup.

CSF

CSF held an account with A.G. Edwards. Mr. Ioane is listed as CSF's employer on the account application. A "Resolution for Association or Other Non-Corporate Organization" associated with that account was signed by Mr. Ioane in his capacity as "Secretary" of CSF.

CSF also held an account with Morgan Stanley.[12] In the investment powers portion of the application for that account, Mr. Ioane was listed as "successor trustee" of CSF. Mr. Ioane was authorized to trade in and withdraw assets from that account.

Canceled checks from CSF's account at Morgan Stanley reflect payments to the Merced Christian School and Stone Ridge Christian High School. Canceled checks from CSF's account at A.G. Edwards reflect payments to Merced Christian School.

Agent Brown used the bank deposits method to reconstruct CSF's income for 2002 and 2003. He determined that CSF had unexplained bank deposits of $1,309,482.22 in 2002 and of $58,410 in 2003. He also determined that CSF had received $5,036.41 in dividends in 2002 and $10,613.64 in dividends in 2003.

ACF

ACF held an account at Citibank. Petitioners both possessed signature authority over that account. ACF also held an account

---

[12]That account was started with Dean Witter, Inc., before it merged with Morgan Stanley.

at A.G. Edwards.  Mr. Ioane is listed as CSF's employer on the account application.  A "Resolution for Association or Other Non-Corporate Organization" associated with that account was signed by Mrs. Olson-Ioane in her capacity as "Secretary" of CSF and by Mr. Ioane in his capacity as "President" of ACF.  Petitioners both had check-writing authority over that account.  In addition, ACF held an account with Morgan Stanley.  In the application for that account, petitioners were listed as trustees of ACF. Petitioners were the only persons authorized to trade in that account.

Mrs. Olson-Ioane wrote check No. 1027 dated December 8, 2003, for $1,295 payable to cash from ACF's Citibank account. Canceled checks Nos. 2002 and 2003 from ACF's account at A.G. Edwards reflect payments of $100 and $600, respectively, to Merced Christian School and Stone Ridge Christian High School. Petitioners both signed those checks.

Agent Brown used the bank deposits method to reconstruct ACF's income for 2002 and 2003.  He determined that ACF had unexplained bank deposits of $496,066.32 in 2002 and of $106,759.12 in 2003.  He also determined that ACF had received $377.81 in dividends in 2002 and $11,469.04 in dividends in 2003.

PST

On a Schedule B, Interest and Ordinary Dividends, attached to their 2002 joint Federal income tax return, petitioners

reported having received $481 from PST.  On a Schedule C, Profit or Loss from Business, attached to that return petitioners reported $40,000 in gross receipts.  In a supporting statement also attached to that return, petitioners attributed $20,000 of those gross receipts to "MANAGEMENT FEE PST".

On November 2, 2004, Mr. Ioane filed with the Tax Court a "Consent to Rescind Notice of Deficiency", which the Court construed as a petition on PST's behalf and to which it assigned docket No. 21064-04. Therein, he referred to himself as "general trustee" and "underlying funding Source and POA for PARADISE SOLUTIONS".  He listed the East John Street address as PST's address.

Agent Brown's bank deposits analysis led him to determine that PST had unreported income of $19,922 in 2003.

ACM

ACM held an account at Wells Fargo Bank.[13]  A check made payable to Mr. Ioane was deposited in that account.[14]  Canceled checks reflect payments to Capital One, Target, Providian Financial, and Blue Cross of California on petitioners' behalf from that account.  They also reflect payments to Mr. Ioane from

---

[13]Although Agent Brown identified a number of other accounts held by ACM doing business as one of the five aforementioned trusts, he treated those accounts as belonging to the relevant trust and not to ACM.

[14]That check, No. 0862982, was a $30 check from "Topics Entertainment".

that account.  Those checks were all signed using the signature stamp of "Laurel Fierro".

Agent Brown's bank deposits analysis led him to conclude that petitioners had $140,710.68 in distributions from ACM for 2003.

On March 1, 2006, respondent issued the aforementioned notice of deficiency.  Petitioners then filed a timely petition with this Court.  A trial was held on January 7, 10, and 18, 2008, in Reno, Nevada.

OPINION

I.  Evidentiary Issues

Received into evidence at trial were a number of exhibits consisting of checks, account applications, signature cards, bank statements, and deposit slips pertaining to FAP, AFT, CSF, ACF, PST, and ACM.  Mr. Ioane objected to the admissibility of those exhibits on the grounds of relevance, authentication, and hearsay.  We overruled his objections as to the checks but reserved ruling on the admissibility of the account applications, signature cards, bank statements, and deposit slips.  As explained below, we will now overrule his objections as to those documents and admit them into evidence.

A. Relevance

We apply the Federal Rules of Evidence applicable in nonjury trials in the U.S. District Court for the District of Columbia.

Sec. 7453; Rule 143(a); see Clough v. Commissioner, 119 T.C. 183, 188 (2002).

Rule 401 of the Federal Rules Of Evidence defines "Relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The account applications, signature cards, bank statements, and deposit slips are clearly relevant to whether FAP, AFT, CSF, ACF, and PST had unreported income in 2002 and 2003 and whether such income is attributable to petitioners. The documents pertaining to ACM are clearly relevant to whether petitioners received distributions from ACM in 2003.

B. Authentication

Rule 901(a) of the Federal Rules of Evidence provides that "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(b) of the Federal Rules of Evidence sets forth a nonexclusive list of "examples of authentication or identification conforming with the requirements of [Rule 901]". Among them is subdivision (b)(4), which provides that the authentication requirement can be satisfied by "Appearance, contents, substance, internal patterns, or other

distinctive characteristics, taken in conjunction with circumstances."

The authenticity of the disputed documents is supported by Agent Brown's testimony that he received them in response to summonses issued to financial institutions with which FAP, AFT, CSF, ACF, PST, and ACM held accounts.[15]  Their authenticity is also supported by their content, analyzed in connection with the circumstances of this case.  See Alexander Dawson, Inc. v. NLRB, 586 F.2d 1300, 1302 (9th Cir. 1978) ("The content of a document, when considered with the circumstances surrounding its discovery, is an adequate basis for a ruling admitting it into evidence.").  In that regard, we agree with respondent that the checks (which have already been admitted), account applications, signature

---

[15]Under Fed. R. Evid. 902(11), if certain conditions are satisfied, domestic records of regularly conducted activity are self-authenticating.  To qualify, such records must be accompanied by a written declaration of their custodian or another qualified person.

Respondent initially offered (and, on the basis of the attached affidavits, the Court admitted) the disputed documents into evidence with the supporting affidavits.  However, it eventually came to light that, contrary to the Court's initial understanding, respondent had provided the disputed documents-- but not the attached affidavits--to petitioners before trial.  This had the effect of denying petitioners the opportunity mandated by Fed. R. Evid. 902(11) to review and (if they desired) challenge the documents.  The Court then indicated that it intended to reverse its initial decision to admit the evidence under Fed. R. Evid. 902(11).  Respondent withdrew the evidence and resubmitted it without the affidavits.  The disputed documents therefore do not qualify for admission pursuant to Fed. R. Evid. 902(11).

cards, bank statements, and deposit slips serve to reinforce each other's authenticity.  We therefore find that the disputed documents bear sufficient guaranties of trustworthiness for admissibility under rule 901 of the Federal Rules of Evidence and overrule petitioners' authentication objections as to the admissibility of those documents.[16]

C. <u>Hearsay</u>

Rule 801(c) of the Federal Rules of Evidence defines "Hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Hearsay is generally excluded from evidence unless an exception applies.[17]  See Fed. R. Evid. 802; <u>Snyder v. Commissioner</u>, 93 T.C. 529, 532 (1989).

Respondent argues on brief that the bank statements and deposit slips "are not needed to prove the truth of any particular deposit or other transaction from any of the

---

[16]Although respondent argues tersely that the disputed documents are documents relating to commercial paper under Fed. R. Evid. 902(9), we need not rely on that proposition.

[17]Fed. R. Evid. 803(6) is a hearsay exception for records of regularly conducted activity that operates together with Fed. R. Evid. 902(11).  In fact, this Court often merges its analyses of admissibility under those provisions.  See <u>Stang v. Commissioner</u>, T.C. Memo. 2005-154, affd. 202 Fed. Appx. 163 (9th Cir. 2006); <u>Major v. Commissioner</u>, T.C. Memo. 2005-141, affd. 224 Fed. Appx. 686 (9th Cir. 2007); <u>Spurlock v. Commissioner</u>, T.C. Memo. 2003-124.  Because Fed. R. Evid. 803(6) incorporates the certification requirement of Fed. R. Evid. 902(11), the disputed documents do not qualify for admission under Fed. R. Evid. 803(6).

accounts." Instead, respondent contends that those documents "can be admitted for non-hearsay purposes such as showing that a trust had a particular bank account, that respondent's determinations in the notice of deficiency were not arbitrary and capricious, and to provide an evidentiary foundation connecting petitioners to the unreported income." Respondent does not address the account applications and the signature cards.

We agree with respondent regarding the bank statements and the deposit slips and conclude that all of the disputed documents (including the account statements and signature cards) are hearsay and so cannot be admitted for the truth of their contents, but they are admissible to establish a minimal evidentiary foundation for the unreported income. See Avery v. Commissioner, 574 F.2d 467, 468 (9th Cir. 1978) (affirming this Court's decision to admit hearsay evidence for the limited purpose of demonstrating that the Commissioner's determination was not arbitrary but not as substantive proof of the amount of the deficiency), affg. T.C. Memo. 1976-129; Costa v. Commissioner, T.C. Memo. 1990-572 ("In establishing the necessary evidentiary predicate, hearsay evidence may be admissible for purposes of showing that the notice was not arbitrary, particularly when that evidence is buttressed by other substantive evidence".).

In addition, rule 807 of the Federal Rules of Evidence, a residual exception to the hearsay rule, provides a sound basis for admitting those documents to prove the truth of the matters asserted therein. The core of that rule is that hearsay not specifically covered by the exceptions in rule 803 or 804 of the Federal Rules of Evidence is not excluded from evidence if it bears "equivalent circumstantial guaranties of trustworthiness". Fed. R. Evid. 807; see United States v. Sanchez-Lima, 161 F.3d 545, 547 (9th Cir. 1998) ("Hearsay evidence sought to be admitted under Rule 807 [of the Federal Rules of Evidence] must have circumstantial guaranties of trustworthiness equivalent to the listed exceptions to the hearsay rule.").

Under rule 807 of the Federal Rules of Evidence, hearsay not covered by the exceptions in rule 803 or 804 of the Federal Rules of Evidence is not excluded by rule 802 of the Federal Rules of Evidence if the Court determines that: (1) The statement is evidence of a material fact; (2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) the general purposes of the Federal Rules of Evidence and the interests of justice will best be served by admitting the statement into evidence. Rule 807 of the Federal Rules of Evidence also requires notice to the adverse party before trial of the proponent's intent to offer the statement into evidence.

We are convinced that the disputed documents possess circumstantial guaranties of trustworthiness equivalent to those in the other hearsay exceptions.  As we have already observed, those documents were produced by financial institutions in response to summonses and their veracity is reinforced by other evidence already of record.  See supra pp. 6-13.  As for the other requirements of rule 807 of the Federal Rules of Evidence, the disputed documents are material and are more probative than any other evidence of record on the unreported income issue. Finally, petitioners received adequate notice of respondent's intent to introduce the disputed documents into evidence at trial.  In fact, petitioners actually received the documents themselves and respondent's 27-page pretrial memorandum well in advance of trial.[18]  We therefore overrule petitioners' hearsay objections and admit the disputed documents into evidence.[19]

---

[18]The only items that petitioners did not receive before trial were the supporting affidavits.  Petitioners were certainly on notice of respondent's intent to offer the account applications and signature cards into evidence at trial.

[19]On brief, petitioners appear to object to the admissibility of the copies of the checks on the basis of the best evidence rule.  Those checks are properly admissible electronic duplicates of the paper originals and their admission does not run afoul of the best evidence rule.  Fed. R. Evid. 1003.

II.  Unreported Income

A.  Burden of Proof

Section 61(a) specifies that "Except as otherwise provided", gross income includes "all income from whatever source derived".  The Commissioner's determination of a taxpayer's liability for an income tax deficiency is generally presumed correct, and the taxpayer bears the burden of proving that the determination is improper.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Where unreported income is involved, the Court of Appeals for the Ninth Circuit[20] has held that the presumption of correctness applies once the Commissioner introduces some substantive evidence reflecting that the taxpayer received unreported income.  Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), affg. T.C. Memo. 1997-97.  If the Commissioner introduces such evidence, the burden shifts to the taxpayer to show by a preponderance of the evidence that the deficiency was arbitrary or erroneous.[21]  Id.  As explained below, respondent

---

[20]Absent stipulation to the contrary, the appropriate venue for an appeal of the decision in this case is the Court of Appeals for the Ninth Circuit.  See sec. 7482(b)(1)(A), (2).

[21]Although sec. 7491(a) may shift the burden of proof to the Commissioner in specified circumstances, petitioners have fallen far short of satisfying the prerequisites under sec. 7491(a)(1) and (2) for such a shift.  Petitioners did not present any credible evidence at trial, and Mr. Ioane's testimony lacked any semblance of credibility.  In addition, petitioners did not

(continued...)

has introduced sufficient evidence connecting petitioners with the unreported income.  Consequently, respondent's determination is entitled to the presumption of correctness.

B. Bank Deposits Method of Proof

Respondent used the bank deposits method of proof to reconstruct the incomes of FAP, AFT, CSF, ACF, and PST for 2002 and 2003.  Respondent also used that method to determine the amount of distributions from ACM to petitioners in 2003. "Deposits in a taxpayer's bank account are prima facie evidence of income, and the taxpayer bears the burden of showing that the deposits were not taxable income but were derived from a nontaxable source."  Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), affg. T.C. Memo. 1998-121.  "The bank deposits method assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income, but the Government must take into account any nontaxable source or deductible expense of which it has knowledge."  Clayton v. Commissioner, 102 T.C. 632, 645-646 (1994) (citing DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), affd. 959 F.2d 16 (2d Cir. 1992)).

Agent Brown used summonses to gather information regarding bank and brokerage accounts held by FAP, AFT, CSF, ACF, PST, and

_____

[21](...continued)
comply with the substantiation requirements and have been generally uncooperative in their dealings with respondent.

ACM.  His bank deposits analysis was based largely on that information.  To avoid double-counting deposits attributable to transfers made between accounts and to avoid counting deposits derived from nontaxable sources, Agent Brown reduced the entities' taxable income for 2002 and 2003 to account for such deposits.  Documents detailing Agent Brown's bank deposits analysis have been admitted into evidence in this case.

Petitioners have provided no credible evidence demonstrating error in respondent's bank deposits analysis, choosing instead to focus on other errors purportedly committed by respondent. Respondent has introduced ample evidence reflecting that the trusts had unreported income in 2002 and 2003.  We now turn in more detail to whether petitioners should be charged with that unreported income--an issue whose outcome turns on the nature of their relationship with those entities.

C. The Trusts as Disregarded Entities

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."  Gregory v. Helvering, 293 U.S. 465, 469 (1935).  "However, this right does not bestow upon the taxpayer the right to structure a paper entity to avoid tax when that entity does not stand on the solid foundation of economic reality."  Zmuda v. Commissioner, 79 T.C. 714, 719 (1982), affd. 731 F.2d 1417 (9th Cir. 1984).  Because we

look to substance over form, a paper entity that lacks economic substance and is in reality a sham may be disregarded entirely for Federal income tax purposes. See id. at 720.

We have looked to four factors in determining whether a trust has economic substance: (1) Whether the taxpayer's relationship to the transferred property differed materially before and after the trust's creation; (2) whether the trust had an independent trustee; (3) whether an economic interest passed to other trust beneficiaries; and (4) whether the taxpayer respected restrictions imposed on the trust's operation as set forth in the trust documents. See, e.g., Markosian v. Commissioner, 73 T.C. 1235, 1243-1244 (1980); Lundgren v. Commissioner, T.C. Memo. 2006-177.

Although our analysis of the four factors is made difficult by petitioners' lack of cooperation with Agent Brown and with the Court's stipulation process under Rule 91(a), the evidence before us compels the conclusion that petitioners treated the trusts as their personal pocketbooks, depositing and withdrawing funds at their convenience.

1. Petitioners' Relationship to Trust Property

Because the trust agreements underlying FAP, AFT, CSF, ACF, and PST are not of record, it is not clear who formed the trusts or what, if any, property was transferred into them at their inception. The evidence does reflect that petitioners dominated

the trusts and that the transfer of property into the trusts did not alter any cognizable economic relationship between petitioners and the transferred property.  See <u>Markosian v. Commissioner</u>, <u>supra</u> at 1241.  Money was frequently deposited into the trusts' accounts, and petitioners' actions indicate that they were free to do as they pleased with that money.  Consequently, this factor points to a lack of economic substance.

    2.  <u>Independence of Trustees</u>

Petitioners have not demonstrated that any of the trustees were independent of the trusts.  The trustees of CSF and ACF were certainly not independent:  Mr. Ioane was listed as successor trustee of CSF, and petitioners were both listed as trustees of ACF.  Checks from FAP and AFT were signed using the signature stamps of purported trustees and successor trustees, none of whom testified at trial.[22]  We can infer that their testimony would have been unfavorable to petitioners.  See <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).  Who was trustee of PST is even less clear, but Mr. Ioane referred to himself as "general trustee" in a Tax Court petition.  Ultimately, petitioners have not shown that any of the trusts had an independent trustee.  Consequently, this factor points to a lack of economic substance.

---

[22]The AFT checks were also signed by Mrs. Olson-Ioane.

3.  Economic Interests of Beneficiaries

Agent Brown testified that he did not know who the trust beneficiaries were.  Because the relevant trust arrangements are not of record, that question remains unanswered.[23]  The evidence reflects that petitioners treated the trusts' accounts as their own.  Petitioners have failed to demonstrate that economic interests flowed from the trusts to anyone other than petitioners themselves.  Consequently, this factor points to a lack of economic substance.

4.  Respect for Trust Restrictions

Petitioners had unfettered access to trust property, which indicates that they were not restrained by trust restrictions, if there were any, or by trust law.  They paid their personal bills and took cash from the trusts' accounts.  In addition, it appears that at some point PST, FAP, and AFT lent petitioners unknown sums of money.[24]  Petitioners have not demonstrated that those loans were bona fide.  There is no evidence of written loan agreements, the terms of the loans, or any payments by

_____

[23]We do have a little information regarding PST and AFT. Although Mr. Ioane's testimony was far from credible, he testified that PST "is actually a trust that was created probably about 40 years ago * * * in the island of American Samoa" and that he and his wife transferred their home to PST in 1995.  He also testified that his children "were a break-off beneficiary" of PST and that PST was itself a beneficiary of AFT.

[24]Petitioners deducted interest payments on those loans (and other loans) on their 2002 return.  Respondent has disallowed those itemized deductions, among others.

petitioners.  Consequently, this factor points to a lack of economic substance.

Mrs. Olson-Ioane did not testify at trial.  Mr. Ioane did testify, but his testimony was evasive, plagued by feigned memory lapses, and generally unbelievable.  He denied controlling the trusts and claimed to be no more than an independent contractor working for the trusts.  He characterized payments of petitioners' personal expenses by the trusts as loans that were repaid, reimbursements for expenditures that he had made on the trusts' behalf, or payments to him in lieu of money that was owed to him for his work.[25]  The evidence supports none of his assertions.

We conclude that the trusts were mere alter egos of petitioners that lack any semblance of economic substance.  Accordingly, we shall disregard them for Federal income tax purposes.  See Sparkman v. Commissioner, 509 F.3d 1149, 1156 n.6 (9th Cir. 2007) ("An entity without economic substance, whether a sham partnership or a sham trust, is a sham either way and hence is not recognized for federal tax law purposes."), affg. T.C. Memo. 2005-136.  Petitioners are therefore liable for Federal

---

[25]If the money was owed to him for his work, he asserts it was treated as income on petitioners' returns.

income tax on the trusts' unexplained receipts and dividends, see underline supra note 2, for 2002 and 2003.[26]

D. <u>ACM</u>

Using a bank deposits analysis, respondent determined that petitioners received $140,710.68 in distributions from ACM in 2003. ACM's bank records and canceled checks support respondent's determination, and petitioners have not demonstrated otherwise.

Petitioners assert that ACM was the alter ego of Gerald and Ona Lindsey. A second default judgment entered by the U.S. Bankruptcy Court for the District of Idaho on July 30, 2004, refers to ACM and a "Golden Opportunity Trust" as "nominees or alter egos of Debtors Gerald and Ona Lindsey." Petitioners contend that "This means all of [ACM's] income belonged to the Lindsey's (sic), and no one else" and that, because respondent failed to contest the issue in bankruptcy court, respondent "cannot now argue otherwise".

---

[26]Petitioners argue on brief that they cannot be held liable for tax on the unreported income because tax on that income has already been assessed against the trusts. They are incorrect. Where there are two potential taxpayers, an assessment of tax on the same income against both--a whipsaw assessment--is permissible to protect the Commissioner's ability to ensure collecting the tax. See, e.g., <u>Fayeghi v. Commissioner</u>, 211 F.3d 504, 508 (9th Cir. 2000), affg. T.C. Memo. 1998-297; <u>Centel Communications Co. v. Commissioner</u>, 920 F.2d 1335, 1339 (7th Cir. 1990), affg. 92 T.C. 612 (1989). To prohibit the tax from now being assessed against petitioners would be to allow them to avoid tax by hiding behind the very sham entities that were created for tax avoidance.

Petitioners are wrong in all relevant respects.  Whether or not ACM is an alter ego of Gerald and Ona Lindsey has nothing to do with whether petitioners (and petitioners' personal expenses) were paid out of ACM's account in 2003.  Because petitioners and their personal expenses were paid out of ACM's Wells Fargo account in 2003, they are liable for tax on that unreported income.[27]

## III.  Self-Employment Tax

Respondent determined that petitioners are liable for self-employment tax for both years at issue.  Section 1401 imposes a tax on the self-employment income of every individual.  Section 1402(b) defines "self-employment income" as an individual's "net earnings from self-employment".

On brief, respondent asserts that "Petitioners earned the income as sole proprietors, and therefore, their income is subject to the self-employment tax."  Petitioners have provided no evidence demonstrating that their unreported income was not self-employment income.  They are therefore liable for the self-employment tax determined by respondent for 2002 and 2003.

## IV.  Schedule C Deductions

Petitioners claimed $14,562 in Schedule C deductions on their 2002 return and $14,823 in Schedule C deductions on their

---

[27]Petitioners have not argued (and there is no evidence suggesting) that payments from ACM to petitioners or on petitioners' behalf were for some reason nontaxable.

2003 return.  Respondent disallowed those deductions in their entirety.

Deductions are a matter of legislative grace, and the taxpayer must maintain adequate records to substantiate the amounts of any deductions or credits claimed.  Sec. 6001; INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs.  The taxpayer bears the burden of proving entitlement to any claimed exemptions or deductions; the taxpayer's burden includes the burden of substantiation. Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. 540 F.2d 821 (5th Cir. 1976).

Section 162(a) authorizes a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  A trade or business expense is ordinary for purposes of section 162 if it is normal or customary within a particular trade, business, or industry and is necessary if it is appropriate and helpful for the development of the business.  Commissioner v. Heininger, 320 U.S. 467, 471 (1943); Deputy v. du Pont, 308 U.S. 488, 495 (1940).

Petitioners have not submitted into evidence any records in support of their claimed business expense deductions.  In support of those deductions, petitioners have presented Mr. Ioane's self-serving testimony that the records were provided to respondent's

auditor "at that time" and "I believe this is accurate".[28]  Mr.
Ioane also testified that the Schedule C expenses were
"accurate".  This is woefully insufficient to demonstrate
entitlement to deductions for any business expenses.
Accordingly, we conclude that petitioners are not entitled to any
Schedule C deductions for business expenses.

V.    NOL and NOL Carryover Deductions

Petitioners claimed deductions for a $99,172,118 NOL in 2002
and a $99,134,330 NOL carryover in 2003.  Respondent disallowed
those deductions in their entirety.

Section 172(a) allows NOL deductions.  Section 172(c)
defines an NOL as "the excess of the deductions allowed by this
chapter over the gross income", as modified by section 172(d).
"[Section] 172 provides specific rules allowing NOLs to be
carried back to preceding taxable years and carried forward to
future years to reduce a taxpayer's taxable income."  Med James,
Inc. v. Commissioner, 121 T.C. 147, 153 n.9 (2003).  A taxpayer
claiming an NOL deduction for a taxable year must file with the

---

[28]Petitioners also argue belatedly that they cannot
substantiate their deductions because relevant records were
seized when a search warrant was executed at their house in June
2006.  We do not believe that they are unable to substantiate
their deductions because respondent has the necessary evidence
and has refused to return it to them.  They have no proof that
such evidence is in respondent's possession or that respondent
has refused their request to return such evidence.  There is no
evidence that they attempted to obtain any relevant records from
respondent's Criminal Investigation Division.

tax return for that year a concise statement setting forth the amount of the NOL deduction claimed and all material and pertinent facts, including a detailed schedule showing the computation of the NOL deduction.  Sec. 1.172-1(c), Income Tax Regs.

Petitioners claimed staggering NOLs but presented no documentary evidence in support of those losses and appear to have forgotten their genesis.  At trial Mr. Ioane testified that the claimed NOL resulted from a theft loss in 2001.  When asked "Can you tell us what object was stolen or was lost in a casualty?", he responded:  "You know, I don't recollect how that was calculated."  When asked if he knew the object that was lost or destroyed, Mr. Ioane responded:  "No, I don't recall any of that information."  After the Court commented that it is hard to believe that someone would incur such immense losses and have no idea how, Mr Ioane asserted:  "I know it related to some losses in real estate, and promissory notes, and medical losses, and related to medical loss."  Mr. Ioane's testimony was evasive and unbelievable.  Petitioners have not demonstrated that they are entitled to any NOL deductions or deductions for any other type of loss.

VI.  Itemized Deduction for Medical and Dental Expenses in 2002

Petitioners claimed an $8,840 deduction for medical and dental expenses in 2002.  Respondent disallowed that deduction.

Section 213(a) allows for the deduction of personal medical and dental expenses to the extent that they exceed 7.5 percent of adjusted gross income (AGI). Although respondent concedes that petitioners have substantiated $3,182.82 in medical expenses for 2002, that is less than the applicable $7,850 standard deduction for 2002. Also, in light of our earlier conclusions, petitioners' 2002 AGI is significantly higher than the enormous loss that they reported on their 2002 return. This warrants an upward adjustment of the 7.5-percent floor for deductions for medical and dental expenses, which would in any event preclude petitioners from deducting such expenses. Petitioners have failed to demonstrate entitlement to an itemized deduction for medical and dental expenses for 2002.

VII. Exemptions and Credits

Petitioners claimed a deduction of $15,000 for personal exemptions in 2002 and a deduction of $15,250 for personal exemptions in 2003. They claimed an earned income credit of $2,194 in 2003. And they claimed additional child tax credits of $1,800 and $1,377 in 2002 and 2003, respectively. Respondent disallowed the claimed exemptions and credits.

The relevant exemptions and credits are all reduced or phased out if a taxpayer's AGI exceeds certain amounts. See secs. 24(b), 32(a)(2), 151(d)(3). In light of our opinion sustaining the deficiencies determined by respondent,

petitioners' 2002 and 2003 AGI is increased to the extent that they are ineligible for any of the claimed personal exemption deductions or credits.

VIII.  Addition to Tax and Penalties

A. Burden of Production

Under section 7491(c) the Commissioner bears the burden of production with respect to a taxpayer's liability for penalties or additions to tax.  This means that the Commissioner "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty."  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  In instances where an exception to the penalty or addition to tax is afforded, for example, upon a showing of reasonable cause or substantial authority, the taxpayer bears the burden of "[coming] forward with evidence sufficient to persuade a Court that the Commissioner's determination is incorrect."  Id. at 447.

B.  Section 6651(a)(1) Addition to Tax

Respondent determined that petitioners are liable for an addition to tax under section 6651(a)(1) for 2002.  We agree with respondent.

Section 6651(a)(1) imposes an addition to tax of 5 percent per month or a fraction of a month up to a maximum of 25 percent for failure to file a timely return unless it is shown that such failure is due to reasonable cause and not to willful neglect.

Petitioners argue that respondent has not met the burden of production because respondent has not shown that they failed to file any return. Petitioners are incorrect. In order to satisfy the burden of production, respondent does not have to show that petitioners failed to file any return, only that their 2002 return was filed late. Respondent has done so. The return itself reflects that respondent received it on June 23, 2003. That is the date on which the return is deemed to have been filed.[29] Petitioners have not introduced any evidence reflecting that their failure to file a timely return was supported by reasonable cause. Accordingly, we conclude that petitioners are liable for the section 6651(a)(1) addition to tax for 2002.

C. <u>Section 6662(a) Accuracy-Related Penalties</u>

Section 6662(a) imposes an accuracy-related penalty on an underpayment of tax that is equal to 20 percent of any underpayment that is attributable to one of the causes listed in subsection (b). Among those causes is negligence or disregard of rules or regulations and a substantial understatement of income tax. Sec. 6662(b)(1) and (2). Respondent contends that petitioners are liable for the section 6662 penalty because (1) their underpayment of income tax in 2002 and 2003 resulted from

---

[29]Because there is no evidence that petitioners mailed that return on or before its due date, the timely-mailed-is-timely-filed rule in sec. 7502(a) is inapplicable. See sec. 7502(a)(2).

negligence and (2) they substantially understated their income tax for both years.

Section 6662(c) defines negligence as "any failure to make a reasonable attempt to comply with the provisions of this title". "[D]isregard" is defined to include "any careless, reckless, or intentional disregard." Id. Under caselaw, "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

There is a "substantial understatement" of an individual's income tax for any taxable year where the amount of the understatement exceeds the greater of (1) 10 percent of the tax required to be shown on the return for the taxable year or (2) $5,000. Sec. 6662(d)(1)(A). However, the amount of the understatement is reduced to the extent attributable to an item (1) for which there is or was substantial authority for the taxpayer's treatment thereof, or (2) with respect to which the relevant facts were adequately disclosed on the taxpayer's return or an attached statement and there is a reasonable basis for the taxpayer's treatment of the item. See sec. 6662(d)(2)(B).

There is an exception to the section 6662(a) penalty when a taxpayer can demonstrate (1) reasonable cause for the underpayment and (2) that the taxpayer acted in good faith with respect to the underpayment.  Sec. 6664(c)(1).  Regulations promulgated under section 6664(c) further provide that the determination of reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances."  Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners were negligent and substantially understated their 2002 and 2003 Federal income tax liabilities.  They used a number of entities in order to obscure their true income, and they claimed a nearly $100 million NOL and cannot remember why.  They have not demonstrated that any of the exceptions applies.  They are therefore liable for the section 6662 penalties determined by respondent.

D.  Section 6673(a)(1) Penalty

Section 6673(a)(1) authorizes the Tax Court to impose a penalty not in excess of $25,000 on a taxpayer for proceedings instituted primarily for delay or in which the taxpayer's position is frivolous or groundless.  "A position maintained by the taxpayer is 'frivolous' where it is 'contrary to established law and unsupported by a reasoned, colorable argument for change in the law.'"  Williams v. Commissioner, 114 T.C. 136, 144 (2000) (quoting Coleman v. Commissioner, 791 F.2d 68, 71 (7th Cir.

1986)).  Although respondent does not ask us to impose a penalty upon petitioners under section 6673(a)(1), we may impose such a penalty sua sponte.  See <u>Pierson v. Commissioner</u>, 115 T.C. 576, 581 (2000).

Months before trial, when he was not cooperating in the stipulation process, we warned Mr. Ioane of the possible imposition of a section 6673 penalty.[30]  Undeterred, he continued to be uncooperative in the stipulation process.  His behavior throughout these proceedings has been marked by a lack of candor. His arguments have been nothing but frivolous and groundless.  As a consequence, we shall impose upon petitioners a $10,000 penalty pursuant to section 6673(a)(1).

The Court has considered all of petitioners' contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[30]Mrs. Olson-Ioane has not participated in person in these proceedings in any meaningful way.

APPENDIX

Table:  Examples of Checks Reflecting (on a Preponderance of Available Evidence) Payments to Petitioners, by Petitioners, or on Behalf of Petitioners from the Entities' Accounts

| Account Holder | Institution | Check No. | Date | Payee | Amount | Memo Section |
|---|---|---|---|---|---|---|
| FAP | Saratoga/San Jose National Bank | 4808 | 02/01/2002 | Capital One | $1,198.69 | An account number followed by "Michael S. Ioane" |
| FAP | Saratoga/San Jose National Bank | 4864 | 02/26/2002 | Merced Christian School | $1,301.50 | "IOANE/Balance of tuition due + $1.50 Nov. ECS" |
| FAP | Saratoga/San Jose National Bank | 5032 | 06/14/2002 | Mike Ioane | $4,000 | "car purchase" |
| FAP | California Federal Bank | 6006 | 05/13/2002 | Target - Retailers National Bank | $543.26 | An account number followed by "For: Shelly J. Olson" |

| FAP | California Federal Bank | 6013 | 05/13/2002 | Capital One | $466.66 | "Michael S. Ioane" followed by an account number |
|-----|------------------------|------|------------|-------------|---------|----------------------------------------------------|
| FAP | California Federal Bank | 6014 | 05/13/2002 | Capital One | $470.11 | "Shelly J. Ioane" followed by an account number |
| FAP | California Federal Bank | 6068 | 06/16/2002 | Capital One | $704.28 | "Mike Ioane" followed by an account number |
| FAP | California Federal Bank | 6084 | 06/14/2002 | Shelly Olson-Ioane | $4,100 | Signed using signature stamp of Laurel Fierro. |
| FAP | California Federal Bank | 6104 | 06/28/2002 | Merced Christian School | $255 | The memo section contained the name of one of petitioners' children. |
| FAP | California Federal Bank | 6214 | 08/21/2002 | Tracy Kupfer | $137.74 | "For: Shelly Ioane + $10 postage" |

| FAP | California Federal Bank | 6219 | 08/23/2002 | Merced Christian School | $20 | The memo section contained the name of one of petitioners' children followed by "hot lunches-Sept 2002" |
|-----|------------------------|------|------------|-------------------------|-----|------|
| FAP | California Federal Bank | 6263 | 09/06/2002 | Golden Ram Sportsman's Club, Inc. | $850 | "Mike Ioane – 'Family Pack'" |
| FAP | California Federal Bank | 6268 | 09/12/2002 | The Scottish Rite | $60 | Renewal for a member number followed by "Michael Ioane" |
| FAP | California Federal Bank | 6329 | 10/08/2002 | Blue Cross of California | $550 | A "certificate" number followed by "Michael S. Ioane" |
| FAP | California Federal Bank | 6481 | 12/13/2002 | Blue Cross of California | $550 | The same certificate number that was on check no. 6329 |

| AFT | Saratoga National Bank | 229 | 04/02/2002 | The Charitable Scholarship Foundation | $834,000 | Blank. Signed by Mike Ioane and using the signature stamp of Jeffrey P. Rosenberg. |
|---|---|---|---|---|---|---|
| CSF | A.G. Edwards | 2019 | 12/15/2003 | Stone Ridge Christian High School | $2,356.50 | Blank. Signed using signature stamp of Laurel Fierro. |
| ACF | California Federal Bank | 1017 | 11/21/2003 | Morgan Hill Lodge | $1,071 | "Dues life" signed by Mike Ioane |
| ACF | California Federal Bank | 1027 | 12/08/2003 | Cash | $1,295 | "$1,285- cashiers check" signed by Shelly J. Olson |
| ACF | A.G. Edwards | 2002 | 12/20/2002 | Stone Ridge Christian High School | $600 | Illegible. Petitioners both signed the check |
| ACF | Morgan Stanley | 10516060 | 11/14/2002 | MICHAEL SCOTT IOANE AND SHELLY JEAN IOANE TTEES F/T [ACF] TRUST DTD 1-1-93 | $30,300.40 | N/A |

| ACM | Wells Fargo | 7962 | 10/21/2003 | Mike Ioane | $1,967 | Blank. Signed using signature stamp of Laurel Fierro. |
|-----|-------------|------|------------|------------|--------|--------|
| ACM | Wells Fargo | 8037 | 11/19/2003 | Mike Ioane | $1,993.50 | Blank. Signed using signature stamp of Laurel Fierro. |