UNITED STATES of America,
Plaintiff–Appellee,

v.

Gabriel SANCHEZ–LIMA,
Defendant–Appellant.

No. 97–50146.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 10, 1998.

Decided Aug. 19, 1998.

As Amended on Denial of Rehearing
and Suggestion for Rehearing
En Banc Dec. 11, 1998.*

* Judges Schroeder and Pregerson have voted to reject the suggestion for rehearing en banc, and    Judge Goodwin recommended rejection.

Vincent J. Brunkow, Steven F. Hubachek, Federal Defenders of San Diego, Inc., San Diego, California, for defendant-appellant.

Jacqueline J. Jackson, Daniel Butcher, Assistant United States Attorneys, San Diego, California, for plaintiff-appellee.

Before: GOODWIN, SCHROEDER, and PREGERSON, Circuit Judges.

GOODWIN, Circuit Judge:

Gabriel Sanchez–Lima appeals from his conviction for assault on a federal officer in violation of 18 U.S.C. § 111. Sanchez–Lima assigns error to (1) the district court's refusal to admit sworn videotaped statements of eyewitnesses that were deported to Mexico shortly after the incident; (2) the district court's denial of Sanchez–Lima's motion for depositions of said eyewitnesses; (3) the district court's admission into evidence of a Border Patrol Officer's opinion that another Border Patrol Officer who testified before the jury was telling the truth; and (4) the district court's failure to instruct the jury that the government had the burden of disproving self-defense beyond a reasonable doubt. We have jurisdiction under 28 U.S.C. § 1291. We reverse.

I.

On May 22, 1996, Sanchez–Lima was arrested approximately two miles east of the Otay Mesa Port of entry. The government contends that Sanchez–Lima attacked Border Patrol Agents Salzano and Kermes, who were trying to arrest him.

The government presented evidence at trial that tended to show that Agent Bush directed Agents Kermes, Salzano, and Martinez to a group of aliens on Otay Mountain. When the agents first attempted to apprehend the group, Sanchez–Lima escaped, pushing Agent Kermes away. The three agents then consolidated the aliens that they had captured.

Agent Bush subsequently located three more aliens crawling through the brush and directed Agent Salzano to them. As Agent Salzano attempted to sneak up on the aliens, however, Sanchez–Lima struck Agent Salzano in the head with a rock. Next, Sanchez–

Lima fled directly to Agent Kermes' position and tried to take Agent Kermes' gun. Agent Kermes subdued Sanchez–Lima by striking him in the head with his firearm.

The defense presented evidence that Agent Kermes lied on the stand, and that at the beginning of the incident, Agent Kermes pistol whipped Sanchez–Lima as he was trying to escape. Consequently, when Sanchez–Lima later encountered Agent Salzano sneaking up on him through the brush-without using his flashlight and without identifying himself-Sanchez-Lima reasonably believed that he was in immediate danger of another beating. The defense's arguments were supported by the Grand Jury testimony of several aliens that they heard Sanchez–Lima screaming that he was being beaten at the beginning of the incident.

In all, the Border Patrol agents apprehended twenty-two aliens. The Border Patrol and the Federal Bureau of Investigation interviewed these aliens on May 22, 1996. Sanchez–Lima alleges that these interviews contained evidence in support of· a self-defense theory.

On May 28, 1996 at 4:45 p.m., an Assistant United States Attorney, sent a facsimile letter to the lawyer originally assigned to represent Sanchez–Lima. This letter stated that the government had interviewed the witnesses and that there was no material exculpatory information regarding the assault. The letter also stated that the deportation of the witnesses would commence the next day, May 29, 1996.

A defense investigator took the witnesses' statements late on May 28, 1996 and reported to defense counsel on the morning of May 29, 1996. Believing that the aliens were being deported that day, however, counsel did not file a material witness complaint.

Yet, as it turns out, the witnesses were not deported that day. Instead, the prosecutor examined the witnesses before the Grand Jury. The prosecutor failed to inform counsel that the witnesses were not being deported on May 29, 1996. The aliens were ultimately deported to Mexico on May 31, 1996.

On June 6, 1996, the government filed a two-count indictment alleging that Sanchez–

Lima assaulted two federal officers in violation of 18 U.S.C. § 111. The jury returned a verdict of guilty on count one, relating to the assault on Agent Salzano, but hung on count two, relating to the assault on Agent Kermes. Sanchez–Lima filed a timely notice of appeal on March 4, 1997.

II.

Sanchez–Lima first argues that the sworn, videotaped statements of the eyewitnesses in Mexico should have been admitted into evidence under the "catch-all" hearsay exception of the Federal Rule of Evidence 804(b)(5), now recodified as Federal Rule of Evidence 807. Sanchez–Lima asserts that the failure to admit this evidence in conjunction with the district court's denial of Sanchez–Lima's motion for depositions of these witnesses, denied him his Sixth Amendment right to present a defense. We agree.

■ Hearsay evidence sought to be admitted under Rule 807 must have circumstantial guarantees of trustworthiness equivalent to the listed exceptions to the hearsay rule. *See United States v. Fowlie,* 24 F.3d 1059, 1069 (9th Cir.1994). Furthermore, the statement must (1) be evidence of a material fact; (2) be more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) serve the general purposes of the Rules of evidence and the interests of justice by its admission into evidence. Fed.R.Evid. 807.

■ The videotaped statements in this case met. all of these requirements. The statements possessed guarantees of trustworthiness because the declarants (1) were under oath and subject to the penalty of perjury; (2) made the statements voluntarily; (3) based the statements on facts within their own personal knowledge; (4) did not contradict any of their previous statements to government agents and defense investigators; and (5) had their testimony preserved on videotape which would allow the jurors an opportunity to view their demeanor. *See Barker v. Morris,* 761 F.2d 1396, 1401–03 (9th Cir.1985). The government had an opportunity to develop the testimony of these

witnesses before they were deported, and the government also had notice and the option to participate in taking the videotaped statements. Although the government declined to cross-examine the witnesses during the videotaped session, cross-examination is not required in every case. *Id.* Finally, the videotaped statements constituted evidence of a material fact regarding Sanchez–Lima's self-defense theory and honest mistake of fact as to the agents' identity. These statements are more probative than any other evidence which could be procured by reasonable efforts, including the Grand Jury testimony which lacked some of the critical evidence contained in the videotape.

Accordingly, the district court erred in refusing to admit the videotaped testimony, especially in light of the district court's previous denial of Sanchez–Lima's motion to depose these witnesses. Federal Rule of Criminal Procedure 15(a) provides in relevant part:

> [W]henever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition . . .

Fed.R.Crim.P. 15(a).

Ordinarily, exceptional circumstances exist when the prospective deponent is unavailable for trial and the absence of the testimony would result in an injustice. This court has held that it is unjust to deprive a defendant of what may be crucial exculpatory evidence. *See People of the Territory of Guam v. Ngirangas,* 806 F.2d 895, 897 (9th Cir.1986).

The eyewitnesses in this case were unavailable for trial but were willing to be deposed. Because their testimony could have supported a self-defense theory based upon Sanchez–Lima's reasonable mistake as to the agents' identity, it was in the interests of justice to allow Sanchez–Lima to take the depositions. Contrary to the district court's finding, Sanchez–Lima did not have an "extended opportunity for depositions" in this case prior to the deportation of the witnesses.

In refusing to admit the sworn videotaped testimony after denying Sanchez–Lima the opportunity to depose these witnesses, the district court effectively prevented Sanchez–Lima from exercising his Sixth Amendment right to present a defense.

### III.

Sanchez–Lima next argues that the district court abused its discretion and committed reversible error when it permitted Agent Loven to testify, over objection, to his opinion as to whether Agent Kermes told him the truth during his post-incident interview. We agree.

"It is the jurors' responsibility to determine credibility by assessing the witnesses and witness testimony in light of their own experience." *United States v. Binder,* 769 F.2d 595, 602 (9th Cir.1985). Testimony regarding a witness' credibility is prohibited unless it is admissible as character evidence. *See United States v. Awkard,* 597 F.2d 667, 671 (9th Cir.1979).

Here, Agent Loven testified that, based on his training and experience, Agent Kermes was telling the truth. Agent Loven's testimony bolstered the credibility of Agent Kermes. Although the government maintains that it is permitted to bolster the credibility of a witness who has been impeached, such an attack on credibility does not permit bolstering by inadmissible evidence. This court has already held that opinion evidence regarding a witness' credibility is inadmissible. *See Binder,* 769 F.2d at 602; *Awkard,* 597 F.2d at 671.

The district court's error in admitting Agent Loven's testimony was not harmless. Sanchez–Lima presented evidence that Agent Kermes beat him before the encounter with Agent Salzano. Agent Kermes testified that he did not strike Sanchez–Lima until after the alleged incident with Agent Salzano. Sanchez–Lima's theory of the case required the jury to reject Agent Kermes' account and believe the opposite. The jury's verdict necessarily depended on the credibility of the bolstered witness. The receipt of this oath-

helping testimony over objection was reversible error.

## IV.

■ Sanchez–Lima also argues that he was entitled to a self-defense instruction. A defendant is entitled to jury instructions on the theory of self-defense provided that "there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Lemon*, 824 F.2d 763, 764 (9th Cir.1987)(internal citations and quotations omitted).

■ Upon reviewing the evidence, it is clear that Sanchez–Lima was, in fact, entitled to a self-defense instruction. Sanchez–Lima produced some evidence that he believed he was being attacked by bandits as opposed to border patrol agents. For example, the aliens had previously been warned that thieves that assault undocumented border crossers had crossed the border and were on the mountain. In addition, Agent Salzano did not identify himself to Sanchez–Lima. Sanchez–Lima also offered evidence establishing that Agent Kermes had already assaulted him, causing a head wound. Accordingly, when Agent Salzano surprised Sanchez–Lima by jumping up from behind some shrubbery, a rational jury could conclude that Sanchez–Lima reasonably believed that he was about to receive another beating.

Accordingly, the district court did not err in giving a self-defense instruction. Sanchez–Lima nevertheless contends that the district court erred by not specifically instructing the jury that the government had the burden of proof of disproving self-defense, and that the failure to so instruct the jury constituted reversible error. We agree.

■ "A specific instruction which is defective in respect to the burden of proof is not remedied by correct general statements of law elsewhere given in the charge unless the general statement clearly indicates that its consideration must be imported into the defective instruction." *De Groot v. United States*, 78 F.2d 244, 253 (9th Cir.1935) (internal citations omitted). Here, the district court's three general instructions on the burden of proof do not clearly indicate that they apply to the defective self-defense instruction. Instruction No. 5 merely stated that "[t]he government has the burden of proving every element of the charge beyond a reasonable doubt. If it fails to do so, you must return a not guilty verdict." This instruction, by its express terms, applied to the elements of the charge as opposed to the elements of an affirmative defense, such as self-defense. Instruction No. 6 stated that "[i]f after consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty." This instruction also failed to inform the jury that the government had to disprove beyond a reasonable doubt any claim of self-defense. Finally, instruction No. 8 stated that "the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence because the burden of proving guilt beyond a reasonable doubt is always assumed by the government." Again nowhere in this instruction is reasonable doubt mentioned in connection with self-defense.

■ The district court's failure to give jury instructions that clearly indicated that the government had the burden of disproving self-defense was reversible error.

## V.

Based on the above assigned errors, we reverse and remand for a new trial.

REVERSED AND REMANDED.