**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

JONATHAN LEAL-DEL CARMEN,
  *Defendant-Appellant.*

No. 11-50094

D.C. No.
3:10-cr-01372-W-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Thomas J. Whelan, Senior District Judge, Presiding

Argued and Submitted
January 11, 2012—Pasadena, California

Filed September 14, 2012

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt and
William A. Fletcher, Circuit Judges.

Opinion by Chief Judge Kozinski

11237

**COUNSEL**

Harini P. Raghupathi, Federal Defenders of San Diego, San Diego, California, for the defendant-appellant.

Laura E. Duffy, United States Attorney, and Bruce R. Castetter and David P. Curnow (argued), Assistant United States Attorneys, San Diego, California, for the plaintiff-appellee.

**OPINION**

KOZINSKI, Chief Judge:

May the government deport an illegal alien who can provide exculpatory evidence for a criminal defendant before counsel for that defendant has even been appointed? We believe the answer is self-evident, as the government recognized in an earlier case where it moved to vacate a conviction after it deported witnesses whose testimony would have exculpated defendant. *See United States* v. *Ramirez-Lopez*, 315 F.3d 1143 (9th Cir. 2003), *withdrawn by United States* v. *Ramirez-Lopez*, 327 F.3d 829 (9th Cir. 2003); Joint Motion to Remand Case to the District Court for the Limited Purpose of Dismissing the Indictment (Feb. 5, 2003); *see also* Henry Weinstein, *Appeal Lost, Yet Freedom Won*, L.A. Times, Apr. 23, 2003, at B1. We had assumed, following *Ramirez-Lopez*, that the government would refrain from putting aliens who could provide exculpatory evidence beyond the reach of the court and defense counsel. But whatever wisdom the United States Attorney for the Southern District of California gained in *Ramirez-Lopez* appears to have applied to that case and that defendant only. We change that today.

## I. FACTS

On March 25, 2010, border patrol agents discovered a group of twelve illegal aliens hiding in the thick brush in

Smith Canyon, an area along the United States–Mexico border that is unprotected by a fence. The agents determined they were Mexican nationals present in the United States without permission and took them into custody. Later that day, the agents picked up two sets of footprints that they recognized from Smith Canyon. They followed the tracks and eventually found Jonathan Leal-Del Carmen and Domingo Gomez-Aguilar. The agents arrested them on suspicion of alien smuggling.

That night, border patrol agents interviewed at least four of the aliens about Leal-Del Carmen and Gomez-Aguilar. One of them, Ana Maria Garcia-Garcia, identified Leal-Del Carmen in a photospread and said she had first seen him about two days earlier. When Agent Tomas Macias Jr. asked if Leal-Del Carmen gave orders to the rest of the group, she answered, "No, he didn't give orders." After the officer said "Pardon me?," she again stated, "He did not give orders." When the officer asked a third time "No?," she answered "No."[1]

Three others identified Leal-Del Carmen as a leader or as someone with whom they made travel arrangements. The government kept these three as material witnesses[2] but

---

[1] **Macias**: Oh, but he, number 5 [Leal-Del Carmen], was he in front of the group, was he behind, did he give orders, what did he do?

**Garcia**: No, he didn't give orders.

**Macias**: Pardon me?

**Garcia**: He did not give orders.

**Macias**: No?

**Garcia**: No.

**Macias**: Who, who gave orders, the orders?

**Garcia**: It is that I don't know.

[2] The government's three witnesses later moved to have their testimony taken by deposition because their continued detention in the United States pending Leal-Del Carmen's trial was a hardship for their families. A magistrate judge granted the motion as to two of the witnesses, whose sworn and cross-examined testimony was presented to the jury by videotape. One remained and testified in person at trial.

deported Garcia-Garcia and the eight other aliens appre-
hended at Smith Canyon.[3]

Leal-Del Carmen had not yet been arraigned, and thus was
not represented by counsel, when Garcia-Garcia was

---

[3]It's not clear from the record whether border agents interviewed the
eight other aliens in the group. At a motion hearing, Leal-Del Carmen's
attorney asked the government to produce any statements taken from those
witnesses: "I can't tell whether there was actually a statement taken, even
if it was unrecorded, for the other eight material witnesses. . . . I have no
statements from these eight individuals at all." The Assistant United States
Attorney represented that he was not aware of any statements but would
turn them over if they could be found. Defense counsel apparently never
received any statements, because in his jury summation he argued, "And
for the nine other witnesses we have no idea because nobody bothered to
question them, or ask them or see what they knew."

We find it suspicious that the government would interview some of the
witnesses but not the others. It's also curious that the testimony of the sin-
gle exculpatory witness happened to be included on the tape with the
inculpatory witnesses. The government argued before the district court
that a border agent made the video of Garcia-Garcia's interview because
he believed her testimony wasn't exculpatory and wanted to show he
wasn't "hiding anything." But the agent couldn't have known what
Garcia-Garcia would say before she said it. Either the agent made videos
of all the witnesses but preserved only some, or he first interviewed them
without a video recorder and then replicated some of the interviews on
tape. Either alternative leaves us skeptical that the government did not
question the eight other aliens it apprehended.

The Assistant United States Attorney disavowed that there were audio
or video recordings of the eight others, saying he "inquired about that spe-
cific point," but he produced no sworn statement to that effect from any
of the agents involved. Nor does the record disclose any evidence as to
notes the agents may have taken in connection with the witness interviews.
It's possible that the agents made such notes but did not produce them
because they did not believe them to be exculpatory. Should the district
court permit a retrial, the government shall provide defendant with all
records of interviews with the aliens in Leal-Del Carmen's group, as well
as sworn declarations from the agents who interviewed the group stating
clearly which aliens the agents spoke with and which ones, if any, they did
not. *See* page 11257 *infra*. The declarations shall also state whether any
interview notes or recordings have been discarded or destroyed.

deported. His lawyer thus had no opportunity to interview Garcia-Garcia, and the government didn't disclose that she had provided exculpatory testimony. Instead, defense counsel had to make several discovery requests, which eventually forced the government to turn over the videotaped interviews of its material witnesses.[4] This videotape included Garcia-Garcia's interview. On discovering her statements, Leal-Del Carmen moved to dismiss the indictment on the ground that the government had deported an exculpatory witness. The district court denied the motion. Leal-Del Carmen subsequently filed a motion in limine seeking to admit the videotaped statement of Garcia-Garcia, which the district court denied. At trial, the district court also declined to give Leal-Del Carmen's proposed missing-witness jury instruction.

The jury deliberated over the span of two days before delivering a split verdict. It convicted Leal-Del Carmen of three counts of bringing in illegal aliens without presentation in violation of 8 U.S.C. § 1324(a)(2)(B)(iii) and acquitted him of three counts of bringing in illegal aliens for financial gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii). Leal-Del Carmen timely appeals.

---

[4]We were surprised to learn that the Justice Department required defense counsel to make discovery requests rather than voluntarily and promptly turning over discovery materials. Since most criminal defense lawyers are appointed, *see* Caroline Wolf Harlow, Bureau of Just. Stat., *Defense Counsel in Criminal Cases* 1 (2000), the cost of preparing discovery requests is generally paid with public funds. *See* 18 U.S.C. § 3006A(a), (i). It's difficult to understand how the Justice Department justifies imposing this expense on taxpayers and the court, or reconciles it with the government's duty of fairness in criminal cases. *See Berger* v. *United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.").

## II.   DISCUSSION

"Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth Amendment guarantee of due process, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *United States* v. *Stever*, 603 F.3d 747, 755 (9th Cir. 2010) (internal quotation marks omitted). The government undermined Leal-Del Carmen's opportunity to present a complete defense by deporting a witness it knew could give exculpatory evidence. Once Leal-Del Carmen's lawyer discovered that Garcia-Garcia told border agents that his client didn't give orders, he used every recourse to try to put this information before the jury, but the district court would have none of it. At each stage, the court—urged by the government— denied defendant's motions. This prevented the jury from hearing anything at all about the testimony of Leal-Del Carmen's sole favorable witness, thereby depriving him of a "meaningful opportunity to present a complete defense." *Id.*

### A.   DEPORTATION OF THE ONLY FAVORABLE WITNESS

**[1]** We have adopted a two-part test to evaluate whether the government's deportation of an alien-witness amounts to a constitutional violation. First, the defendant must show that the government acted in bad faith. *United States* v. *Dring*, 930 F.2d 687, 693 (9th Cir. 1991). There is no violation where the executive has made a "good-faith determination" that the alien-witness possesses no evidence that might exculpate the defendant. *United States* v. *Valenzuela-Bernal*, 458 U.S. 858, 872-73 (1982). Second, the defendant must demonstrate that deportation of the witness prejudiced his case. *Dring*, 930 F.2d at 693. "To prevail under the prejudice prong, the defendant must at least make 'a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses.'" *Id.* at 693-94 (quoting

*Valenzuela-Bernal*, 458 U.S. at 873). This test balances the defendant's right to present his version of events to the jury with the government's interest in enforcing the immigration laws by promptly deporting aliens who "possess no material evidence relevant to a criminal trial." *Valenzuela-Bernal*, 458 U.S. at 864-66.

### 1.  Bad Faith

**[2]** When the government doesn't know what a witness will say, it doesn't act in bad faith by deporting him. *See Dring*, 930 F.2d at 694. But if the government interviews the witness or has other information suggesting that he could offer exculpatory evidence, the government may not deport him without first giving defense counsel a chance to interview him. The question of bad faith thus turns on what the government knew at the time it deported the witness. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Arizona* v. *Youngblood*, 488 U.S. 51, 57 n.* (1988).

The government here interviewed Garcia-Garcia and learned that she had favorable testimony to give. Agent Macias obviously recognized the significance of her statement that Leal-Del Carmen didn't give orders: He asked the question in the first place, no doubt believing that an affirmative answer would help incriminate Leal-Del Carmen. When he got a negative answer, he repeated the question, which he wouldn't have done had he thought the answer inconsequential.

**[3]** Once the government is aware that an alien has potentially exculpatory evidence, it must treat that person as a material witness and give defense counsel the opportunity to interview him and make a reasoned determination whether to seek his retention pending trial. This means the witness may

not be deported before defense counsel has been retained or appointed and has had a fair opportunity to interview him. If defense counsel advises the government that the witness may be useful to the defense, he may not be deported until defense counsel indicates he is no longer needed. If the government wants to deport the witness notwithstanding defense counsel's wishes, it must obtain permission from the district court on a showing of good cause, which defense counsel must have the opportunity to oppose; it must also afford defense counsel the opportunity to cross-examine the witness and preserve the testimony for trial. *See* note 2 *supra*.

These requirements will not interfere with the execution of the nation's immigration laws. The government remains free to deport witnesses it has no reason to believe possess exculpatory evidence. At most, the government will be required to keep a small number of aliens a few extra days or weeks. The government has already shown that retaining witnesses for trial is not an undue burden, having kept three witnesses to support its own case. The government's duty of evenhandedness and fair play in criminal matters, embodied in such cases as *Berger* v. *United States*, 295 U.S. 78 (1935), and *Brady* v. *Maryland*, 373 U.S. 83, 87-88 (1963), allows it to "strike hard blows" but not "foul ones." *Berger*, 295 U.S. at 88. The government is uniquely empowered to deport witnesses and thus put them outside the reach of defense counsel and the district court. It may not use that power to give itself an unfair advantage. *See California* v. *Trombetta*, 467 U.S. 479, 486 (1984) ("[W]e have suggested that the Federal Government might transgress constitutional limitations if it exercised its sovereign powers so as to hamper a criminal defendant's preparation for trial.").

## 2.  Prejudice

To show prejudice, Leal-Del Carmen must make "a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in

ways not merely cumulative to the testimony of available witnesses." *Valenzuela-Bernal*, 458 U.S. at 873. "'[I]mplicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.'" *Id.* at 868 (quoting *United States* v. *Agurs*, 427 U.S. 97, 104 (1976)).

**[4]** Leal-Del Carmen has shown prejudice because Garcia-Garcia's testimony was material, favorable and not cumulative. Her statements that Leal-Del Carmen didn't give orders were material to his role as the expedition's guide. Charged with alien smuggling, Leal-Del Carmen could have been found guilty only if the jury believed that he was leading the group, rather than himself being led by someone else. Garcia-Garcia's statement that Leal-Del Carmen didn't give orders during the two days the party traveled together suggests that he wasn't one of the guides. Her testimony also casts doubt on the government's witnesses, whose uncontradicted testimony was that Leal-Del Carmen did give orders. As the government concedes, "Unquestionably, Ms. Garcia-Garcia's statements that 'He did not give orders' were favorable to Leal-Del Carmen." Resp't Br. 29 (internal citation omitted).

**[5]** The government argues that Garcia-Garcia's statements were "'merely cumulative to the testimony of available witnesses.'" Resp't Br. 29 (quoting *United States* v. *Pena-Gutierrez*, 222 F.3d 1080, 1085 (9th Cir. 2000)). The district court also relied on its finding that Garcia-Garcia's testimony was cumulative of that of other witnesses, particularly of her boyfriend, Gabriel Gonzales-Ramirez. Although Gonzales-Ramirez mentioned specific instances when Leal-Del Carmen didn't speak or give orders, these statements clashed with other answers in which he said Leal-Del Carmen *did* give orders or otherwise acted as the leader of the group. The overall effect of the government's three witnesses was to identify Leal-Del Carmen as a guide. In contrast, Garcia-Garcia said nothing at all that incriminated Leal-Del Carmen and three times explicitly denied he gave orders. The district court

clearly erred in finding that her testimony would have been cumulative of that of the government's witnesses.

The government also argues that Garcia-Garcia's testimony wouldn't have helped much because she traveled in the middle of the group of twelve and appeared to have a bad memory, and there was other overwhelming evidence against Leal-Del Carmen. But the weight and credibility of testimony is for the jury to determine. Even if parts of her testimony were vague, her statement that Leal-Del Carmen didn't give orders was crystal clear and thrice repeated. While Garcia-Garcia's testimony may not have been sufficient to prove that Leal-Del Carmen was not the leader, it could well have cast doubt on the testimony of the three government witnesses identifying him as such. That's all a criminal defendant need do to gain an acquittal.

## B.  LUJAN-CASTRO WAIVER

**[6]** Under *United States* v. *Lujan-Castro*, 602 F.2d 877, 878-79 (9th Cir. 1979) (per curiam), the government may ask a criminal defendant to relinquish his right to retain deportable witnesses, but only if the waiver is knowing and intelligent. We have also suggested that the government "cannot evade its constitutional obligations" by seeking a waiver after it determines that a witness is material and favorable to the defense, any more than it can "evade its responsibility to disclose exculpatory evidence by asking the defendant to waive his right to a fair trial." *United States* v. *Medina-Villa*, 567 F.3d 507, 517 n.4 (9th Cir. 2009); *see also Ramirez-Lopez*, 315 F.3d at 1168-70 (Kozinski, J., dissenting).

On at least two occasions, the district court ruled against Leal-Del Carmen on the basis that he had waived his right to retain witnesses.[5] But the government never produced a

---

[5]In denying defense counsel's motion to dismiss the indictment, the court said, "Your client did sign a waiver." Later, in refusing to admit the

signed waiver, and the only evidence in the record that Leal-Del Carmen agreed to have Garcia-Garcia deported is a declaration he attached to his motion to dismiss the indictment: "[T]he agents asked me if I wanted to keep anyone from the large group they had also apprehended as a witness. I did not know what any of the people had said about me. The agents never told me . . . that they had said different things."

**[7]** Failing to request that a witness be retained is hardly the same as waiving the constitutional right to the presence of a favorable witness. The district court's finding that Leal-Del Carmen waived that right is clearly erroneous. Even if he had signed a waiver, it would be patently invalid. As noted, a *Lujan-Castro* waiver must be knowing and intelligent. *See* page 11249 *supra*. Any such waiver would not have been knowing because the border agents failed to apprise Leal-Del Carmen of Garcia-Garcia's favorable statements. And the waiver would not have been intelligent because Leal-Del Carmen was not represented by counsel and thus could make no informed decision about whether releasing the witness would prejudice his case.

## C. EVIDENTIARY ERRORS

The wrongful deportation of Garcia-Garcia might have been rendered harmless if the district court had allowed defendant to inform the jury of her statements. There was both a video and a transcript of the conversation between Agent Macias and Garcia-Garcia, *see* note 1 *supra*, but the district court rebuffed all defense efforts to put these before the jury.

---

videotape of Garcia-Garcia's interview, the court stated, "Most significantly your client had an opportunity to have that witness be kept and he agreed with a waiver and let the witness be released. If there is any issue, I think that forecloses it."

### 1.   Videotaped Testimony and Transcript

The district judge refused to admit the video or transcript, concluding that they weren't "that material" to Leal-Del Carmen's defense that he was part of the group of smuggled aliens, not the smuggler. In the court's appraisal, Garcia-Garcia wouldn't have advanced defendant's case because she was unable or unwilling to provide much detail about the cross-border trip. The court pointed to sections of the interview transcript where she sidestepped the border agent's questions, answering, "Oh, I don't know" or "I wasn't looking." The court concluded, "That to me is certainly not someone who's going to have something that's going to be materially helpful to the defense." The court also determined that Garcia-Garcia's testimony would be cumulative of her boyfriend's.[6]

**[8]** The district court abused its discretion. In the first place, the evidence was material. *See* page 11248 *supra*. Moreover, for the tape or transcript to be admissible, they didn't have to be "material" to the defense; they only had to be relevant. Fed. R. Evid. 402 (1975) (amended 2011).[7] The district court confused the showing Leal-Del Carmen had to make to obtain dismissal of the indictment or other sanctions —that the government deported a witness with information material and favorable to the defense—with the substantially lower threshold for admitting evidence at trial. *Compare* Fed. R. Evid. 401 (1975) (amended 2011) (defining relevant evidence as that which has a tendency to make any fact of consequence more or less probable) *with Pennsylvania* v. *Ritchie*,

---

[6]The district judge made these findings at the August 2010 hearing where he denied the motion to dismiss the indictment. The judge expressly renewed those findings in later denying the motion in limine to admit the videotape. *See* Tr. Jury Trial 32, Nov. 16, 2010 ("I will adopt the ruling that I previously made.").

[7]We cite to the version of the Rules of Evidence that was in place when Leal-Del Carmen was tried in November 2010. The rules discussed in this section were amended in 2011, but the changes made were stylistic only. *See, e.g.*, Fed. R. Evid. 402 advisory committee notes.

480 U.S. 39, 57 (1987) ("Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.") (internal quotation marks and alteration omitted). That some of Garcia-Garcia's answers were vague or evasive only renders her clear and unequivocal answer that Leal-Del Carmen gave no orders more convincing. It was for the jury, not the district judge, to evaluate whether her testimony was persuasive.

Presentation of the video or transcript would have taken only a few minutes. *See* note 1 *supra*. Thus, this is not a case where the district court could exclude the evidence because it was cumulative and would take too much time. *See* Fed. R. Evid. 403 (1975) (amended 2011). Even if Garcia-Garcia claimed ignorance of many of the border agent's questions, she was emphatic that Leal-Del Carmen did not give orders. She was "the only witness in a position to . . . contradict the testimony of government witnesses." *Valenzuela-Bernal*, 458 U.S. at 870 (internal quotation marks omitted). Far from being cumulative, her statements were antithetical to the testimony of the government's witnesses and might have helped sow doubt in the minds of the jurors that Leal-Del Carmen was the guide. The Assistant United States Attorney must have believed that Garcia-Garcia's statements made a difference, else he wouldn't have worked so hard to keep the jurors from hearing them.

The government argues for the first time on appeal that Garcia-Garcia's statements are inadmissible hearsay.[8] But the tape was admissible under the forfeiture by wrongdoing hearsay exception. *See* Fed. R. Evid. 804(b)(6) (1997) (amended 2011); *see also Giles* v. *California*, 554 U.S. 353, 359 (2008) (requiring a showing that the government "engaged in conduct *designed* to prevent the witness from testifying").

---

[8]While the government waived the hearsay argument, we address it anyway so as to put it to rest on remand.

Because the government was responsible for rendering Garcia-Garcia unavailable as a witness, admission of the videotape would prevent it from benefitting from its own wrongdoing.

**[9]** The videotape was also admissible under the residual exception, which allows into evidence "[a] statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness," if the court finds:

> (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 807 (1997) (amended 2011).

Our case is closely analogous to *United States* v. *Sanchez-Lima*, 161 F.3d 545, 547 (9th Cir. 1998), where we held that the videotaped statements of deported witnesses were admissible under the residual exception because they had the same "circumstantial guarantees of trustworthiness" as the exceptions listed in Rules 803 and 804. The videotape of Garcia-Garcia's interview has many of the same markers of trustworthiness as the tape in *Sanchez-Lima*. First, the interview was taken under oath. *See id.* Second, Garcia-Garcia made the statements voluntarily based on facts within her personal knowledge. *See id.* Third, testimony preserved on videotape, unlike written notes taken by an officer, shows the demeanor of the witness, allowing a jury to use visual cues to assess credibility. *Id. Sanchez-Lima* controls; the evidence was admissible.

## 2. Missing-Witness Instruction

**[10]** Leal-Del Carmen also asked for a missing-witness instruction informing the jury that it could presume an unproduced witness would have testified unfavorably to the party failing to produce the witness. *See United States* v. *Noah*, 475 F.2d 688, 691 (9th Cir. 1973) ("The failure of a party to produce a material witness who could elucidate matters under investigation gives rise to a presumption that the testimony of that witness would be unfavorable to that party if the witness is peculiarly within the party's control."). There are two requirements for a missing-witness instruction. First, the party seeking the instruction must show that the witness is peculiarly within the power of the other party. *See United States* v. *Brutzman*, 731 F.2d 1449, 1453-54 (9th Cir. 1984), *overruled on other grounds by United States* v. *Charmley*, 764 F.2d 675, 677 n.1 (9th Cir. 1985). Second, under the circumstances, "an inference of unfavorable testimony from an absent witness is a natural and reasonable one." *United States* v. *Bramble*, 680 F.2d 590, 592 (9th Cir. 1982) (internal quotation marks omitted).

**[11]** This second requirement is easily satisfied in light of what we know Garcia-Garcia probably would have said at trial. The government quibbles about the first requirement, arguing that Garcia-Garcia is not "peculiarly" within its power, given that it has no knowledge of where she is in Mexico and therefore has no better chance of finding her than Leal-Del Carmen does. But it's the government's fault that no one knows where she is. The government removed Garcia-Garcia from the country and thus put her beyond the reach of the court and defense counsel. It also failed to obtain and keep her contact information, which would at least have made it possible to seek her voluntary return. *See Noah*, 475 F.2d at 691 n.4 ("The government should not cause a prospective wit-

ness to leave the jurisdiction so that he would not be available to testify.").**⁹**

**[12]** Because Garcia-Garcia is an alien lacking a lawful immigration status, the federal government had exclusive authority to parole her into the country to testify. *See* 8 U.S.C. § 1182(d)(5)(A) (granting the Attorney General discretion to parole aliens into the United States temporarily and for limited purposes); *see also Ortega-Cervantes* v. *Gonzales*, 501 F.3d 1111, 1114 (9th Cir. 2007). For the government to say that it isn't responsible for her absence because it no longer knows where to find her comes close to the classic definition of chutzpah. *See* Alex Kozinski & Eugene Volokh, *Lawsuit, Shmawsuit*, 103 Yale L.J. 463, 467 (1993).

**[13]** Where the government deports a witness who it knows would testify favorably for the defense, the defendant is entitled to have the jury informed. If jurors are not given a missing-witness instruction, their view of the case may skew in the government's favor. Here, Garcia-Garcia's absence was especially damaging because it left the jury with the false impression that each and every alien-witness who accompanied Leal-Del Carmen identified him as one of the guides. The district court abused its discretion by failing to give the missing-witness instruction. What's more, the missing-witness instruction should have been given even if the video-tape or transcript had been admitted. Had Garcia-Garcia been retained, she might well have been able to provide additional exculpatory evidence. The jury could have inferred that she was deported to keep her from doing so.

---

**⁹**In *Noah*, the court found that the witness wasn't peculiarly within the power of the government because there was a break in the relationship between the government and the witness months before the indictment and trial. 475 F.2d at 691. Here, there was no long break. Garcia-Garcia was interviewed by border agents on March 25, 2010, and deported shortly afterwards; Leal-Del Carmen was indicted on April 14, 2010.

## D. HARMLESS ERROR

**[14]** The government's wrongful deportation of a witness with exculpatory evidence, coupled with the district court's evidentiary errors, deprived Leal-Del Carmen of a fair trial and of his constitutional right to present a defense. "This right includes, 'at a minimum, . . . the right to put before a jury evidence that might influence the determination of guilt.'" *Stever*, 603 F.3d at 755 (quoting *Ritchie*, 480 U.S. at 56). Because we've found a violation of the right to present a defense, we must reverse the guilty verdict unless the government convinces us the error was harmless beyond a reasonable doubt. *Id.* at 757.

**[15]** We're not convinced. The introduction of Garcia-Garcia's clear statements that Leal-Del Carmen didn't give orders, as well as the missing-witness instruction, could have planted doubt in the minds of the jurors sufficient for an acquittal. The verdict was close as it was. The jury deliberations spanned two days and ended in a split verdict—Leal-Del Carmen was not guilty of the three counts of bringing in illegal aliens for financial gain and guilty of the three counts of bringing in illegal aliens without presentation. The jury's acquittal on the financial gain counts suggests that it doubted the government witnesses insofar as they testified that they paid Leal-Del Carmen to bring them across the border. More of their testimony may have come into doubt if Garcia-Garcia's testimony had been introduced. Because a jury could have been swayed by Garcia-Garcia's eyewitness account, the constitutional errors were not harmless beyond a reasonable doubt.

## III. CONCLUSION

When we confronted the very same issue in *Ramirez-Lopez*, we understood the government's commendable course of action subsequent to our opinion—seeking vacatur of the opinion and dismissal of the charges against Ramirez-Lopez

—as a commitment that it would refrain from deporting witnesses favorable to the defense without first giving defense counsel an opportunity to interview them. We were therefore surprised to see this same issue coming out of the same district, and to learn that the Assistant United States Attorney who argued the case was seemingly unaware of the office's mea culpa in *Ramirez-Lopez*. As of today, there should be no doubt that the unilateral deportation of witnesses favorable to the defense is not permitted in our circuit.

[16] On remand, the district judge shall decide whether to dismiss the charges against Leal-Del Carmen with prejudice, as a consequence of the government's conduct. Should the district court permit a retrial, it shall determine whether the eight other deported witnesses were interviewed by government agents and, if so, what they each said. The government shall provide testimony or declarations from border agents as to whether they interviewed the remaining members of the group and whether they took notes or otherwise recorded the statements. *See* note 3 *supra*. Leal-Del Carmen must also be allowed to present the videotape of Garcia-Garcia's testimony, the transcript or both, as well as any evidence of what the other eight witnesses said. Leal-Del Carmen shall also be entitled to a missing-witness instruction as to Garcia-Garcia and, depending on what the district court finds, to the other eight deported witnesses as well.

**REVERSED AND REMANDED.**