**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. MAHER OBAGI, AKA Maher Abaji, AKA Mahir Abaji, AKA Mike Abaji, *Defendant-Appellant.* | No.18-50170 D.C. No. 8:13-cr-00001-AG-2 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. MOHAMED SALAH, AKA Mohamed Ismail, AKA Mohamed Morales, AKA Ahmed Salah, AKA Mohamed Ahmed Salah, *Defendant-Appellant.* | No. 18-50171 D.C. No. 8:13-cr-00001-AG-6 OPINION |

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted June 4, 2020
Pasadena, California

Filed July 17, 2020

Before:  John B. Owens and Patrick J. Bumatay, Circuit
Judges, and Donald W. Molloy,[*] District Judge.

Opinion by Judge Owens;
Dissent by Judge Bumatay

---

## SUMMARY[**]

### Criminal Law

The panel reversed Maher Obagi's and Mohamed Salah's convictions for federal mortgage fraud, and remanded for further proceedings, in a case in which the government disclosed after the close of evidence information impeaching a government witness in violation of *Brady v. Maryland*.

The panel wrote that had the information impeaching Halime "Holly" Saad been disclosed prior to the close of evidence, the presumption that juries are presumed to follow their instructions and the normal rules concerning curative instructions would govern, but in this case the genie was out of the bottle.  The panel noted that (1) the government's closing argument theme had been cast—the jury could trust witness Jacqueline Burchell, who had pled guilty in this

---

[*] The Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

investigation and perjured herself in civil deposition, and other cooperators because Saad was an "independent witness" who reliably corroborated Burchell; (2) Obagi's counsel had completed closing argument without the benefit of being able to attack Saad's credibility; (3) Salah could have used evidence that Saad was not a reliable independent witness—and that the prosecution team had failed to discover Saad's severe credibility problems until closing arguments—to attack the thoroughness and even the good faith of the investigation; and (4) one could not expect Salah at the last minute to reframe his defense to incorporate this impeachment.

Rejecting the government's argument that the failure to disclose was not material, the panel wrote that Saad's impeachment substantially weakened the credibility of the government's cooperating witnesses and the strength of its case.

Given the difficulty the jury faced in reaching a verdict, the panel could not say with confidence that the undisclosed impeachment did not affect the jury's judgment.

The panel likewise could not conclude that the district court's instruction fully cured the prejudice that resulted from the *Brady* violation. Noting that it may well be that no instruction (or judge) could have corrected the government's significant error, the panel wrote that it does not criticize the district court for how it handled this fluid and very tricky complication.

Judge Bumatay dissented. Fearing that the panel is unnecessarily curtailing the discretion afforded district courts in responding to *Brady* violations, he would affirm the convictions because the district court ably tailored a remedy

that sufficiently abated the prejudice of the government's late disclosure of evidence.

**COUNSEL**

Craig Wilke (argued), Fullerton, California; Davina T. Chen, Glendale, California; for Defendant-Appellant Maher Obagi.

H. Dean Steward (argued), San Clemente, California, for Defendant-Appellant Mohamed Salah.

Kerry L. Quinn (argued), Assistant United States Attorney; L. Ashley Aull, Chief, Criminal Appeals Section; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

**OPINION**

OWENS, Circuit Judge:

Maher Obagi and Mohamed Salah appeal from their convictions for federal mortgage fraud. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.[1]

## I. BACKGROUND

### A. The Excel Mortgage Fraud Scheme

Obagi and Salah worked for Excel Investments ("Excel"), a mortgage broker that engaged in widespread fraud. To make a long and complicated story short, Excel approached condominium developers and offered to purchase unsold inventory in exchange for kickbacks. Excel would then use part of these kickbacks to make the initial down payments on properties, pocketing the rest. To cover up its activities, Excel created false "marketing agreements" that purportedly reflected Excel's work in advertising the units, when in fact Excel did nothing to promote these sales.

To make this scheme work, Excel also recruited individuals to pose as buyers on the mortgage applications. These "straw" buyers required extensive false paperwork, including bogus employment, income, and asset documentation. At times, Excel staff impersonated the straw buyers (and their supposed employers) when lenders attempted to telephonically verify information listed in the mortgage applications.

---

[1] We resolve the companion appeal, *United States v. Abaji*, No. 18-50241, in a concurrently filed memorandum disposition.

## B.  Obagi's and Salah's Alleged Roles in the Excel Scheme

Obagi began working for Excel in late 2007 and, according to the prosecution, quickly took a leading role in the operation.  He supervised the creation of fraudulent loan documents, communicated with banks, and recruited straw buyers.  He also supervised other Excel employees who impersonated the buyers in phone calls, and he pocketed large sums from the scheme.

Salah played a smaller role at Excel and, unlike Obagi, was not part of the management team.  But, as the government alleged, he assisted in forging tax records and similar documents to ensure that banks would approve the mortgage applications.  He also helped facilitate the bogus straw buyer phone calls by Excel employees and concealed payments to straw buyers by converting Excel checks into cashier's checks.

## C.  The    Indictment,    Trial,    and    Post-Trial Proceedings

In January 2013, an indictment charged Obagi and Salah with conspiracy to commit wire and bank fraud, and Obagi with an additional six substantive counts of wire fraud.  A number of other individuals involved with Excel were charged as well, several of whom pled guilty and agreed to cooperate with the government. Others testified in exchange for immunity.

At trial, the government introduced the fraudulent records that Obagi and Salah allegedly created for Excel. The government also called several cooperating witnesses with significant credibility problems, including escrow officer Jacqueline Burchell.  Burchell testified that Obagi

directed her to conceal the kickback payments, among other things.  In addition, Burchell told the jury that she overheard a conversation between Obagi and Salah explaining why they had developers send kickbacks to Excel instead of reducing the prices of properties.  But Burchell pled guilty in this investigation, participated in a separate mortgage fraud scheme, and perjured herself in a civil deposition.  So to bolster her credibility—as well as that of other cooperating witnesses—the government also presented three Excel witnesses who purportedly never had cut a deal to avoid prosecution.  One such witness was Halime "Holly" Saad, another Excel escrow officer.  Saad, like Burchell, testified that Obagi instructed her to conceal the kickback payments.  The prosecution later described Saad's testimony as going "right to the heart of what was happening at Excel during all the events set forth in the Indictment."

After the close of evidence and during the opening portion of its closing argument, the government highlighted the testimony of Burchell, the cooperating escrow officer.  And to blunt the upcoming defense attack on Burchell's credibility, the government relied heavily on Saad.  The prosecution acknowledged that the jury should "treat cooperating witness testimony more skeptically than you would the average witness," but emphasized that "on all major points, these witnesses' testimonies are corroborated from independent witnesses," as well as by documents and the defendants' own statements.  "In particular, you heard from Holly Saad.  She said she dealt primarily with Maher Obagi as the guy who controlled the escrow process for those properties in Florida."  The prosecutor reminded the jury that Saad had "no agreement[] wherein there's any representation about . . . [her] sentence[] being reduced or non-prosecution, et cetera."  Indeed, Saad testified that she

had not "entered into any agreement" with the prosecutor's office or received immunity in exchange for her cooperation.

Unfortunately, one of prosecution's key tenets during closing—that the jurors could trust the culpable cooperators because they could trust Saad as an independent corroborating witness—was false. During a break between Obagi's and Salah's defense closings, a different prosecutor from the U.S. Attorney's Office who just happened to watch the closing arguments recognized that Saad had in fact received immunity in a *separate* mortgage fraud investigation and alerted the trial prosecutors to the enormous oversight. The prosecution then notified the court and defense counsel about Saad's June 2014 immunity agreement, immediately disclosing both the agreement and two investigative reports.

The introduction of this new information in the middle of closings placed defense counsel and the trial judge in an impossible position. The parties discussed various options, including granting a mistrial, reopening the case to recall Saad to the witness stand, or instructing the jury about Saad's undisclosed immunity agreement.

After extensive discussion, the trial court decided to proceed with the remaining closing arguments, and to instruct the jury as follows:

> It has come to my attention that the United States Attorney's Office and the FBI failed to disclose evidence that the witness, Halime Saad, previously received immunity from the United States Attorney in a separate case, and thereafter, she may have knowingly made false statements to the FBI. This information

is relevant to the witness's credibility in this case.

The failure to disclose this information implicates defendants' right to due process of law. For these reasons, you should disregard the testimony of witness, Halime Saad, and not consider it for any purpose, nor should you consider any arguments made by the government concerning Ms. Saad.

Immediately after crafting the instruction, the trial court told counsel: "That's it. I think you've all made your record, and I think the Ninth Circuit should carefully look at that record and see if I've drawn the line in the right place."

In addition to the three documents disclosed during closings, the government disclosed 3,750 pages of materials the next morning and another 1,000 pages in the month after trial. The defense did not have the opportunity to review any of these materials before the case was submitted to the jury. These documents revealed that Saad was a culpable participant in the separate mortgage fraud scheme, had taken a bribe to falsify escrow documents, lied to law enforcement about her participation in the scheme, admitted to her actions only after receiving limited use immunity from the U.S. Attorney, and remained under investigation by a state agency in connection with her fraudulent activities.

The jury deliberated for three days, then returned guilty verdicts on the conspiracy charge for both Obagi and Salah, convicted Obagi on three substantive counts, and hung on the three remaining substantive counts.

Obagi and Salah moved for a new trial. After extensive briefing and two days of post-trial hearings, the district court

denied the motion. The court found no evidence of intentional misconduct[2] and concluded that the government's failure to disclose did not deprive Obagi or Salah of a fair trial. The court sentenced Obagi to 78 months' imprisonment with $10,042,638 in restitution, and sentenced Salah to 57 months' imprisonment with $7,487,163 in restitution.

The district court recognized the difficulties caused by the prosecution's failure to disclose Saad's immunity deal and related discovery. Urging Obagi and Salah to preserve their objection for appeal, the court stated, "The Ninth Circuit is going to have a look at this." After sentencing, the court allowed Obagi and Salah to remain on release status pending appeal because of the disclosure issue.

## II. DISCUSSION

### A. STANDARD OF REVIEW

We review de novo whether the government violated its discovery obligations. *United States v. Stinson*, 647 F.3d 1196, 1208 (9th Cir. 2011). Where, as in this case, the district court has sanctioned the government for its discovery violations, we review the choice of sanctions for abuse of discretion. *United States v. Garrison*, 888 F.3d 1057, 1064 (9th Cir. 2018).

---

[2] We agree with the district court that the failure to timely disclose Saad's separate immunity agreement was not due to any malfeasance by the prosecutors in this case, but due to an apparent failure to communicate between investigating agents who worked on the various mortgage fraud investigations.

## B.  *BRADY* AND ITS APPLICATION HERE

The government violates its discovery obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), if it suppresses material evidence that is favorable to the accused. *Strickler v. Green*, 527 U.S. 263, 281–82 (1999). Evidence favorable to the accused "includes evidence that would help the defendant impeach a witness." *Sanders v. Cullen*, 873 F.3d 778, 802 (9th Cir. 2017) (citing *Giglio v. United States*, 405 U.S. 150, 154–55 (1972)); *see also* U.S. Dep't of Justice, Justice Manual § 9-5.001 (2020) (imposing disclosure obligations on the government beyond that provided for by either the Federal Rules or the Constitution). Suppression occurs whenever the government fails to disclose evidence, regardless of the government's good or bad faith. *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016). Evidence is material—and therefore requires reversal—when there is "any reasonable likelihood that it could have affected the judgment of the jury." *Id.* (internal quotation marks and citation omitted). Thus, a defendant can prevail under *Brady* even if "the undisclosed information may not have affected the jury's verdict." *Id.* at 1006 n.6; *see also Browning v. Baker*, 875 F.3d 444, 470 (9th Cir. 2017) ("Even if the jury—armed with all of this new evidence—*could* have voted to convict [Browning], we have no confidence that it *would* have done so." (alteration in original) (quoting *Wearry*, 136 S. Ct. at 1007)).

The district court made a noble effort in light of the circumstances to craft a remedy that would protect the rights of the defendants without requiring a mistrial. Ordinarily, "juries are presumed to follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Had the information impeaching Saad been disclosed prior to the

close of evidence, this presumption and the normal rules concerning curative instructions likely would govern here.

But in this case, it was too late—the genie was out of the bottle. Not only had the government's closing argument theme been cast—the jury could trust Burchell and the other cooperators because Saad was an "independent witness" who reliably corroborated Burchell—but Obagi's own counsel had completed closing argument without the benefit of being able to attack Saad's credibility. Asking defense counsel to reframe his theory of the case—both in terms of examining witnesses and arguing to the jury—after he had spoken to the jury for the last time was simply too much.

Saad's testimony did not incriminate Salah to the same extent as Obagi, but the late-disclosed impeachment evidence still could have played an important role in Salah's theory of the case. Salah could have used evidence that Saad was not a reliable independent witness—and still worse, that the prosecution team had failed to discover her severe credibility problems until closing arguments—to attack "the thoroughness and even the good faith of the investigation." *Kyles v. Whitley*, 514 U.S. 419, 445 (1995). The investigating agents in this case failed to uncover Saad's credibility problems before trial, and they could have similarly failed to vet the prosecution's other witnesses. As with Obagi, one could not expect Salah at the last minute to reframe his defense to incorporate this impeachment.

The government argues that the failure to disclose was not material because Saad's testimony was "duplicative of other testimony and evidence." This was not how the government viewed Saad's testimony at trial. Saad's testimony mattered not only because she directly incriminated Obagi, but because she corroborated testimony from the government's cooperating witnesses. Indeed, the

government's closing mentioned Saad by name six times because her corroboration was so important. The government told jurors that they could believe Burchell—a confessed fraudster who testified to receive a favorable plea—because Saad was trustworthy and "independent." The government used Saad to bolster the otherwise dubious credibility of its cooperating witnesses. Saad's impeachment substantially weakened the credibility of those witnesses and the strength of the government's case.

Prejudice is especially likely here because the case was so close. The jury deliberated for three days and still delivered a split verdict on the charges against Obagi. *United States v. Leal-Del Carmen*, 697 F.3d 964, 976 (9th Cir. 2012) (finding prejudice where "jury deliberations spanned two days and ended in a split verdict"); *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc) ("Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case." (internal quotation marks, citations, and alterations omitted)). Given the difficulty the jury faced in reaching a verdict, we cannot say with confidence that the undisclosed impeachment did not affect the jury's judgment.

Nor can we conclude that the district court's instruction fully cured the prejudice that resulted from the government's *Brady* violation. While the instruction informed the jury that the government had erred and that it should disregard Saad's testimony and argument about her, it did not tell the jury that the government's powerful closing was premised on a false narrative—Saad's reliability. Nor did it explain how defense counsel had presented the case one way, only to learn afterwards that the truth was something else. Despite the trial court's best efforts, the failure to disclose Saad's immunity deal "undermine[s] confidence" in the jury's

verdict. *Wearry*, 136 S. Ct. at 1007 (quoting *Smith v. Cain*, 565 U.S. 73, 76 (2012)).

Although we conclude that the instructions given to the jury did not sufficiently cure the problems that the late disclosures created, we do not criticize the district court for how it handled this fluid and very tricky complication— indeed, under these unique circumstances, it may well be that no instruction (or judge) could have corrected the government's significant error.

## III.    CONCLUSION

Because there is a reasonable likelihood that the undisclosed evidence impeaching Saad could have affected the judgment of the jury, we are compelled to reverse the convictions and remand the case to the district court for further proceedings.[3]

**REVERSED AND REMANDED**.

---

[3] Because we reverse on *Brady* grounds, we do not address the other issues raised in the defendants' appeal. The parties or the district court may revisit these issues on remand.

BUMATAY, Circuit Judge, dissenting:

No one questions the seriousness of the government's failure here. I agree with the majority that the government wrongly withheld *Brady* material in failing to disclose impeachment material against its witness, Halime "Holly" Saad, until after closing arguments. The error, even if inadvertent, undermined Maher Obagi's and, to a lesser extent, Mohamed Salah's right to a fair trial.

But, I'm concerned that we have overcorrected for that mistake here. As serious as a *Brady* violation is, that is not the end of the inquiry for us. Even in cases where the government's withholding of *Brady* material prejudices defendants, we still look to the district courts to determine if a remedy is possible short of a mistrial. In this case, a long-serving district court judge, who presided over the lengthy trial, exercised that discretion and fashioned a remedy that adequately cured any prejudice from the government's trial shortcomings. In the majority's view, this cure falls short. In the process, the majority suggests that any *Brady* violation disclosed after closing arguments automatically warrants reversal—a result found nowhere in our precedent. I respectfully dissent.

## I.

We ordinarily affirm guilty verdicts—even where the government commits *Brady* violations—when any prejudice is outweighed by (1) the district court's remedy and (2) extensive evidence of guilt. *See United States v. Garrison*, 888 F.3d 1057, 1065 (9th Cir. 2018). Determining whether the government's *Brady* violation prejudiced defendants, then, requires us to balance the severity of the injury to defendants from the government's conduct against

the court's chosen remedy and the record evidence of guilt as a whole. *Id.*

In *Garrison*, for example, the government repeatedly failed to timely disclose impeachment material regarding its two key cooperating witnesses. 888 F.3d at 1061–62. In response, the district court did not strike the witnesses' testimony, but advised the jury that the government failed to disclose the evidence and that it could draw adverse inferences from this failure. *Id.* at 1064–66. On appeal, we upheld the conviction, holding that in light of the court's instruction and "the extensive evidence against Garrison, we cannot conclude that any prejudice stemmed from the late disclosure." *Id.* at 1055–56.

Moreover, we give deference to district courts in crafting remedies for *Brady* violations. *United States v. Struckman*, 611 F.3d 560, 577 (9th Cir. 2010) (reviewing the district court's *Brady* remedy for abuse of discretion); *see also United States v. Ubaldo*, 859 F.3d 690, 704 (9th Cir. 2017) ("The district court acted within its discretion when it elected to issue a curative instruction rather than granting a mistrial for the purported violation of Rule 16."). "[R]emedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). When the district court's remedy sufficiently mitigates the harm, any prejudice is abated. *See Struckman*, 611 F.3d at 578.

The district court's chosen remedies here fell well within its discretion. First, the court directed the jury to disregard the testimony of Saad in its entirety, as well as any arguments based on it. We've counseled before that striking a witness's testimony in its entirety is a "drastic remed[y]," and should be used only after consideration of less severe

sanctions. *United States v. Polizzi*, 500 F.2d 856, 893 (9th Cir. 1974). Under the presumption that juries generally follow court instructions, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), this directive effectively removed Saad's evidence from the proceedings.

The court also instructed the jury that the government "failed to disclose evidence that [Saad] . . . may have knowingly made false statements to the FBI," and that "[t]he failure to disclose this information implicate[d] defendants' rights to due process of law." The district court's censure of the prosecution was the last thing the jury heard before deliberations, bolstering its leveling force. The district court also afforded defense counsel additional remedies, offering to allow counsel to recall Saad or the government's agents or to re-argue closing. Counsel rejected the court's offer.[1] Given the difficult hand the district court was dealt in the late stage of trial, these instructions were not unreasonable in light of the significant evidence marshaled against the defendants and the discretion granted to district courts in this area. *Struckman*, 611 F.3d at 577.

Finally, after the heat of trial, the district court conducted an extensive evidentiary hearing into the government's actions and assured itself of the proprietary of its chosen remedy. It determined that the government's error was inadvertent, that it attempted to correct the mistake at the first possible moment, and that it had taken steps to avoid similar mistakes in the future. The district court also found that the government did not engage in any "flagrant misbehavior" requiring dismissal. Given the benefit of all

---

[1] This fact makes defendants' claim on appeal that the court didn't do enough hard to swallow.

the facts, the district court determined no mistrial was warranted.

## II.

The district court's actions make even more sense in light of the extensive evidence against the defendants, even excluding Saad's testimony. On the documentary front, the government presented ample evidence that Obagi submitted false mortgage documents in his own name, and received and laundered money pursuant to the scheme. Several other witnesses testified that Obagi directed participants to omit kickbacks from statements submitted to banks and convert personal checks to cashier's checks, participated in management-level meetings, and helped shred documents right before the fraud shut down. Witnesses further testified that both Obagi and Salah impersonated borrowers and employers using cell phones in furtherance of the fraud. And to top things off, investigating agents testified that Obagi *confessed* to knowing his company's actions were "illegal." Likewise, Salah admitted on tape that he forged fake W-2s and other documents.

Given the court's harsh curative instruction and the extensive evidence against defendants, it's hard to see how Saad's testimony makes or breaks the government's case.[2] Saad was not a "star witness." *Cf. United States v. Kohring*, 637 F.3d 895, 905 (9th Cir. 2011) (reversing on a *Brady* violation related to the prosecution's "star witness.") (simplified). As the district court rightly observed, she "only testified for about an hour and a half, during the course of a

---

[2] Saad's unimportance to the government's case is particularly clear in relation to Mohamed Salah, who wasn't even mentioned in her testimony.

three-week long trial." Moreover, Saad's testimony overlapped with that of several other witnesses and covered events pre-dating the defendants' substantive criminal offenses. *Cf. Sivak v. Hardison*, 658 F.3d 898, 914 (9th Cir. 2011) (finding no prejudice where a witness's substantive testimony was "duplicative to the other evidence presented at trial"). In other contexts, we've affirmed guilty verdicts even when the district court erroneously admitted a defendant's confession. *See, e.g.*, *Padilla v. Terhune*, 309 F.3d 614, 621 (9th Cir. 2002). Saad's limited testimony is not nearly as damning as a defendant's confession.

Because the district court ably tailored a remedy that sufficiently abated the prejudice of the government's late disclosure of evidence, I would affirm the convictions. While I understand why the majority's concerns over the government's error lead it to reverse these two convictions, I fear we are unnecessarily curtailing the discretion afforded district courts in responding to *Brady* violations here. For these reasons, I respectfully dissent.